SUPERIOR COURT 
 
 COMMONWEALTH vs. THOMAS MERCADO

 
 Docket:
 0683CR00250
 
 
 Dates:
 June 27, 2023
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 PLYMOUTH
 

 
 Keywords:
 FINDINGS OF FACT. RULINGS OF LAW. AND ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL
 
 

       On June 29, 2009, a jury convicted Defendant Thomas Mercado ("Mercado" or the “Defendant") of the first--degree murder of David Gomes. For the reasons which follow, Mercado's Motion for a New Trial shall be DENIED.

BACKGROUND

      On June l, 2006, Mercado was indicted for the February 6, 2006 murder of David Gomes (the "Victim"). Mercado was then represented by Attorney Robert Galibois. Prior to trial, Mercado filed a spate of discovery motions, including a Motion for Exculpatory Evidence, a Motion for Promises, Rewards and/or Inducements, and a Motion for Past Cooperation by a Witness.

       Mercado additionally filed a Motion to Suppress Statements he had made to law enforcement officials in Puerto Rico in March of 2007. The Court (Ball, J.) held an evidentiary hearing addressed to the suppression motion on January 26, 2009, at which hearing State Trooper Robert Clements appeared as the sole witness. Clements testified that the FBI office in Puerto Rico notified him that a fingerprint match had been made between Mercado and one Ariel Rivera, a man serving a prison sentence in connection with a shooting in Puerto Rico. Clements visited the prison in San Juan, accompanied by a Brockton police officer and a Boston FBI agent.

-1-

Clements testified that, on March 5, 2007, this team of investigators interviewed Mercado in an unlocked office in the prison where he was serving his sentence, but did so without first reading Mercado his Miranda rights. At that time, Mercado identified himself as Ariel Rivera and specifically denied that he was Thomas Mercado. During argument on the motion to suppress, Attorney Galibois stated that, according to police reports, the investigating officers escorted Mercado from the prison in Puerto Rico and interrogated him at a local FBI office. As noted by the Court, however, Clements testified at hearing that police had in fact interviewed Mercado at the prison facility. Ultimately, the Court. citing Commonwealth v. Larkin, 429 Mass. 426 (1999), denied the Defendant's Motion to Suppress, concluding that Mercado had not been in custody when questioned because he was at that time subject only to the normal restraints incident to incarceration.

      Following a hearing on June 19, 2009, the Court (Locke, J.) entered orders of immunity for the following identified witnesses: Corrin Cripps, Jair Barros, Joseph Destefano, Janette Martinez, and Ivan Correia. Cripps, Barros, Martinez and Correia all appeared to testify for the prosecution at trial. Destefano did not. The trial judge (Connor, J.) subsequently granted judicial immunity to Michael Gomes ("Gomes"), the Victim's surviving brother. Gomes testified for the prosecution as well.

      Trial began in this Court on June 23, 2009. Following opening statements, the jury took a view of the second-floor hallway of an apartment at 88 North Main Street in Brockton, the site of the Victim's shooting. The prosecution thereupon called to the stand a series of percipient witnesses to the events surrounding the Gomes homicide.

      Corrin Cripps ("Cripps") testified that, in February of 2006, she was homeless and residing with different people in Brockton. On February 6, 2006, Cripps had been staying at

-2-

Janette Martinez's apartment on the second floor of 88 North Main Street, directly across from the building's stairwell, for about two weeks. Cripps and Martinez were only newly acquainted, and smoked crack cocaine together every day. Cripps testified that she personally got to know the men residing in the apartment to the left of Martinez's, which apartment was rented by one Ivan Correia ("Correia"), whom she knew as "Puffy." On February 6, Cripps went over to this neighboring apartment in order to collect money she was owed for sex. The Victim, Correia and a "Black kid"("Barros") were then sitting at a table in the apartment. There was a black revolver resting on a table near the Victim, as well as cocaine being bagged for sale. The Victim picked up the gun, and angrily told Cripps to tell her friend "Charlie" that he wanted his "friggin' money." Cripps replied that she did not want to get involved. Cripps then ingested a line of cocaine, and left the Correia apartment after about twenty minutes. 

      Cripps then returned to Martinez's apartment, where she encountered  Mercado, whom she knew as "Juanita," and his ''cousin," Pelon. Cripps had been friends with Mercado for some three or four years, and testified that she had never had any prior problems with him. Cripps heard a knock on the door, and Correia and Barros (from next door) appeared and asked for baking soda. Cripps then retrieved some baking soda from the Martinez kitchen for them, and the men returned to Correia's apartment. Mercado thereupon asked Cripps what the men had in their apartment, and Cripps replied that she did not know. So Mercado directed her to go over to the apartment and see. Cripps testified that she believed, based on something Mercado said, that Mercado planned to rip the men off.[1] Cripps then repaired to Martinez's bedroom for about a

--------------------------------------------

[1] Cripps' trial testimony indicated that this was her "perception" based on the substance and tone of what Mercado said to her; but when the prosecutor subsequently asked Cripps whether she had had an actual"conversation"with Mercado about robbing the men who occupied the neighboring apartment, the trial judge twice sustained objections that this question had been "asked and answered." In context, and construed in the light most favorable to the Commonwealth, the record reflects that Mercado conveyed to Cripps that his intention was to steal from these rival

-3-

half-hour, after which she went to Correia's apartment to bring the men scissors. When Cripps returned to Martinez's apartment, Mercado again asked her what the men had next door, and she informed him that they had cocaine.

      The two men again knocked on Martinez's door, this time asking for baggies and a razor. Mercado was at the door and answered loudly, "You ain't getting dick. Have your momma go buy you some baggies." Cripps then returned to Correia's apartment with more baking soda. As she exited that apartment, the Victim, Barros and Correia followed her into the hall. At this point, Cripps saw that Mercado was standing there, leaning against the wall, with his hood up. Cripps then walked into Martinez's apartment and shut the door. A minute or two later, Cripps heard several gunshots in rapid succession coming from out in the hall. She and Martinez continued to get high on drugs all night.

      At about 6:00 a.m. the following morning, police knocked on the door of the 88 North Main Street apartment, but Martinez did not answer. Cripps left the next day, and never saw Mercado or Pelon again. Several weeks later, however, police presented Cripps with a photo array and she selected Mercado's photograph. Cripps acknowledged to the jury that she was testifying under a grant of immunity.

      On cross-examination, Cripps admitted that Martinez was her source for cocaine; and, in the days leading up to the shooting, she and Martinez had been using cocaine all day and every day. Cripps further admitted that she was a crack addict, engaged in sex with Barros and Correia in exchange for cocaine, and would do almost anything for drugs. While Cripps was staying with Martinez, Pelon and someone referred to as "Chocolate" came by several times to supply

--------------------------------------------

drug dealers. But see Commonwealth v. Mercado, 466 Mass. 141, 155 (20J3) (noting that Cripps• statement of belief about Mercado's intent had been objectionable but not objected to).

-4-

Martinez with cocaine. Prior to February 6, it had been some time since Cripps had last seen Mercado; and when Mercado first arrived at the apartment, she hugged him around the waist and did not feel a gun. When Cripps later saw the Victim with a gun in Correia's apartment, he (David Gomes) angrily pointed it toward his brother, Michael, and  said, "We don't mess around." The Victim then placed the gun back on the kitchen table.

      Cripps further conceded on cross-examination that, when she heard gunshots in the hall, she never looked out of the apartment door's peephole. Cripps was high at the time, and continued to get high after the shooting. Cripps also admitted that she has convictions for uttering a false note and possession of cocaine. On redirect examination, Cripps testified that, when she is high on cocaine, she gets an adrenaline rush that lasts for about fifteen minutes. Cocaine does not, however, either impair her ability to know what is going on around her or otherwise affect her memory.

      Janette Martinez confirmed that, on February 6, 2006, Cripps was staying with her at 88 North Main Street and they were regularly getting high on crack. Martinez met Mercado and Pelan for the first time at around 8:00 p.m. that evening. From grand jury minutes read to the jury, Martinez testified that she later overheard a conversation between Mercado, Pelon and a "white kid." After the white kid left, Mercado told Pelon that they were going to "kill the guy." Asthey walked into the hallway, Pelon directed Mercado to take care of this killing. The Court then instructed the jury on the concept of joint venture, and on the permissible use of joint venture statements.

      Martinez testified that Mercado and Pelon left her apartment at around 9:20 p.m., and that she then looked out the door's peephole. Through the peephole, Martinez saw Mercado standing with a pistol against the wall with his arms crossed. Martinez then went into her

-5-

bedroom, from which location she heard the sound of gunshots. Martinez acknowledged, however, that she had previously testified before the grand jury that she in fact saw (through the peephole) Mercado fire the shots from his pistol and then run. At trial, Martinez told the jury that this prior testimony was true, and that she was now very nervous and scared. Martinez further testified that she later circled a picture of Mercado that was presented to her as part of a photo array, confirming to the police that Mercado was the person she had witnessed during the shooting incident. Finally, Martinez acknowledged that she was testifying under a grant of immunity, and admitted that she and Cripps smoked (but did not sell) crack cocaine.

      On cross-examination, Martinez testified that she did not work at the time, and collected SSI disability benefits on account of her depression. Martinez took Seroquel and Depakote, medications that helped her feel better. Martinez admitted that Pelon and Chocolate supplied her with crack cocaine to sell, but insisted that she did not make much money. On February 8, police came to Martinez's apartment and took her to the police station for an interview. Martinez testified that she was very nervous, and that the police told her to tell the truth or they would charge her with drug crimes, she would lose her apartment, and her kids would be taken away. To the extent the police were "pressuring" her, however, Martinez testified repeatedly that they were simply urging her to tell the truth. Martinez also admitted that she had originally told police that she did not see anyone with a gun that night. Martinez had likewise told the grand jury that the person she saw firing a gun was wearing a big coat with a fur hood, and Pelon had a coat like that. At the same time, however, Martinez also told police that Mercado was likewise wearing a matching coat.

-6-

     Jair Barros testified that he is the Victim's brother, and that he was testifying under a grant of immunity. On February 7, 2006,2 Barros was present with the Victim, their stepbrother Michael Gomes ("Gomes"), and Correia at 88 North Main Street. The men were packaging drugs for sale. Barros needed baggies to put the drugs in, scissors to cut the bags' comers, and baking soda to cut (dilute) the drugs. So he and Correia went to Martinez's apartment to obtain those items, and Cripps stated that she would bring them over. Barros had a black 9 mm handgun with one chambered bullet, which he gave to the Victim. The Victim stated that he would hold onto it
to protect Barros while he "did his thing." Barros testified that the Victim and Correia then left the apartment to drop off Gomes. At which point Barros heard  five gunshots, and then opened the apartment door and saw a hand in dark colored clothing shoot two more shots at the Victim's face. Barros pulled the Victim, who was bleeding profusely, back into the apartment and took the gun out of the Victim's waistband in order to go after the shooter. When Barros ran downstairs, however, he did not see anyone. So he returned to the apartment, took the gun (with one bullet still housed in its chamber) apart, put the pieces in separate bags, and threw them away. Barros also flushed drugs down the toilet, because he knew that police would be on their way. On cross- examination, Barros testified that the Victim had enemies, and had been shot before after testifying in a murder case.

      Gomes testified that, on the night of his brother's murder, he was with the Victim and Barros at Correia's apartment, where they were cutting drugs to be processed for sale. Gomes went next door to get a razor and scissors, but was unsuccessful. Later, Cripps came over to Correia's apartment and ingested a line of cocaine, but then returned next door to retrieve

--------------------------------------------

[2] Because the shooting occurred during either the late evening hours of February 6 or the early morning hours of February 7, witness testimony varied with regard to the date.

-7-

scissors. The Victim followed her into the hall. When Gomes stepped into the hallway behind the Victim, he saw the Defendant and also noticed a second man on the stairs who appeared to be approaching him. Gomes and the second man began to fight, in the course of which they fell together down the stairs. As they scuffled, Gomes heard five or six gunshots behind him. Gomes proceeded to grab the coat off of the man, pulling it over his face. After the fight in the stairway, and while Gomes was on the first floor of the building, he observed the Defendant descending the stairs wearing a hood and holding something in his hand. Gomes ran outside, and the Defendant followed him and then turned and ran.

      Gomes did not originally identify Mercado as the shooter in the photo array shown to him by police roughly a week after the February 6 shooting. He did, however, positively identify Mercado at trial as the hooded man he saw running with something in his hand down the hallway of 88 North Main Street immediately after shots were fired.

      State Trooper Robert Clements testified that he became involved in the David Gomes murder investigation in March of 2007, and went to Puerto Rico as part of same. At that time, Clements spoke to Mercado, who was then going by the name of Ariel Rivera. When Clements inquired if he was in fact Thomas Mercado, Mercado replied that he was not. On cross- examination, Clements testified that Mercado had open warrants out of the Brockton District Court. 

      After the lunch break that day, the Court and counsel met outside the presence of the jury to discuss the fact that Correia, who was then in ICE custody, and Joseph Destefano ("Destefano"}, who was being held at the House of Correction, had been immunized but were still refusing to testify. The Court thereupon appointed counsel for Destefano. After counsel

-8-

reported that neither side intended to call Correia as a witness, Correia was released from the proceedings.

      State Trooper Michael Arnold testified that he was assigned to the ballistics section of the State Police Crime Lab, and visited the crime scene at  the second-floor hallway of  88 North Main Street on February 7. Arnold testified that the Victim had sustained a total of six gunshot wounds, including fatal wounds to his neck and abdomen. Arnold further observed bloodstains and gunshot damage on the rug. He recovered two 9 mm shell casings in the apartment building's hallway, as well as a bullet from under the rug. The wall in the hallway had two areas of damage consistent with gunshot entrance holes. Arnold  recovered  one  9 mm bullet  from inside the wall, and another from inside the closet of a nearby apartment. He also recovered four 9 mm shell casings at the bottom of the stairway to the third floor. Based on microscopic analysis, Arnold concluded that all six bullets had been fired from the same semiautomatic weapon. On February 7, Arnold went to a nearby shooting site on Waverly Street, where he recovered two .45 caliber shell casings.

      When the Commonwealth called Destefano to testify, Destefano refused to do so despite his prior grant of immunity. The Court thereupon found Destefano in contempt, and sentenced him to one year in the House of Correction (or less if he complied with the subpoena to testify prior to the conclusion of the trial). Destefano d id not testify at trial, and served his contempt sentence.

      Malanie Knases testified that she is a DNA analyst at the State Police Crime Lab, and swabbed the cuff of the jacket that had been found in the second-floor hallway at 88 North Main Street. The DNA  profile from that swab was a mixture from three individuals. Knases was unable to include or exclude the known standards from the Victim and Mercado. Mercado was,

-9-

however, excluded as the source of a DNA profile developed from filter paper found on a cigarette butt in the hallway. Knases explained that spent shell casings and bullets are not typically a viable source of touch DNA, and that she had not tested them for this reason. On cross-examination, Knases testified that she was not given any known DNA samples from Michael Cardosa, Jordan Lamore, or Alexskip Algarin for comparison to the jacket and filter paper. The Commonwealth then rested its case, and the Court denied Mercado's motion for a required finding of not guilty.

      The defense then presented its case. Robert Tratzinski testified that, on February 6, 2006, he was walking up Linden Street to North Main Street. As he approached the building at 88 North Main Street, he heard two gunshots and saw someone run by before taking a left onto Haverhill Street. The man was Black, wearing jeans and a plaid shirt. On cross-examination, Tratzinski admitted that he did not see where the man had come from. Tratzinski stated that he had been smoking crack that night, which sometimes  affects his ability to perceive and remember things.

      Rui Barbosa testified that, on February 6, 2006, he lived at 17 Waverly Street in Brockton, next to the Hess gas station on North Main Street. Barbosa  was there playing cards with the Victim and two friends named Jose and Freddie. After the Victim and the others left, Barbosa heard several gunshots outside his house and saw someone in a dark hoodie running away. Toe following day, Barbosa saw a bullet in the windshield of a car parked outside his house. Barbosa testified that he was very good friends with the Victim, and saw him almost every day. Defense counsel attempted, over objection, to ask Barbosa whether the Victim had any enemies. At sidebar, defense counsel indicated that he wanted to ask whether the Victim had previously been shot while appearing as a witness in a murder trial. The Court, however,

-10-

excluded that question, because counsel's offer of proof was too general and did not suggest that Barbosa knew anything more specific about the prior incident.

      Jair Barros testified that, after the shooting, he spoke to his brother [Michael Gomes), who described the shooters. Barros then gave the names "Derrick" and "Jay" to Trooper Kenneth Wong, one of the investigators assigned to the case.

      Trooper Wong testified that Barbosa told him he heard shots outside of his house at Waverly Street about a half-hour before the Victim left there. Trooper Wong further testified that Barros told him that Gomes had suggested the names Derrick and Jay as the shooters. The defense then rested its case, and renewed Mercado's motion for a required finding of not guilty. The Court denied this motion.

      The following day, defense counsel informed the Court that Mercado had since decided that he wished to take the witness stand. Mercado then testified that, on the evening of February 6, 2006, Destefano drove him to the airport to pick up his mother, who was at that time returning from Puerto Rico. Later that evening, Mercado walked to 88 North Main Street, where Destefano lived on the fourth floor. On his way there, Mercado met up with Pelon, who stated that he knew some girls. Mercado and Pelon then went to Martinez's apartment, where Cripps was present. Mercado told Pelan that he knew those girls, and they were drug addicts. So Mercado called Destefano to see if he might be interested. Destefano came downstairs, but then quickly left. Mercado testified that he remained in the kitchen of the apartment until around 10:30 p.m., when he went home. Mercado then traveled to Puerto Rico to visit his girlfriend there for her birthday.

      On cross-examination, Mercado admitted that, when he spoke to Trooper Clements in Puerto Rico, he gave him the name "Ariel Rivera". However, Mercado denied doing this because he knew he was wanted for murder, and testified that he had nothing to do with the Victim's

-11-

shooting. Mercado further testified he had met Pelon a few weeks before that incident, and did not know his real name. Mercado denied that he was involved in any scheme to rob other drug dealers. When asked whether he had  heard Cripps' and  Martinez's testimony, Mercado stated that it was not true and that they were smoking crack. The prosecutor asked : "So you're saying they're lying?" and Mercado replied, "Of course." The defense then rested its case, and renewed (a second time) Mercado's motion for a required finding of not guilty. The Court once again denied that motion. 

      In closing argument, defense counsel argued that Cripps and Martinez were lying to protect their cocaine suppliers, Pelon and Chocolate, and had been pressured by police to incriminate Mercado as the shooter. Counsel also argued that the police had failed to conduct a thorough investigation of the Gomes murder.

      The Court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter based on sudden combat. On June 29, 2009, the jury convicted Mercado of first-degree murder based on premeditation, extreme atrocity or cruelty, and felony murder.

      Mercado appealed his conviction, and Attorney Paul Maidman was appointed to represent him in the appeal. On October 6, 2011, Mercado also filed a new trial motion under Mass. R. Crim. P. 30. Mercado argued that he bad received ineffective assistance of counsel in connection with the motion to suppress, because trial counsel had failed to adequately inform the motion judge that the interview had in fact occurred at the FBI office in Puerto Rico rather than inside the prison where Mercado was then incarcerated. In a Memorandum of Decision and · Order dated March 13, 2012, the trial judge (Connor, J.) denied the new trial motion, concluding that, if there had been any error, it was on the part of the motion judge rather than counsel.

-12-

      The Supreme Judicial Court ("SJC") affirmed both Mercado's murder conviction[3] and the denial of his new trial motion. See Commonwealth v. Mercado, 466 Mass. 141 (2013). The SJC agreed with the motion judge that trial counsel had not been ineffective. The Court further concluded that, even if the admission of Mercado's statement to the police bad been error, it did not create a substantial likelihood of a miscarriage of justice given the other strong evidence against Mercado (including evidence of consciousness of guilt). Id. at 148-50. The SJC further concluded that closure of the courtroom during the witness immunization proceedings did not violate Mercado' s right to a public trial, and that any misstatement in the jury instructions with respect to the burden of proof did not create a substantial likelihood of a miscarriage of justice.
Id. at 151-54.

      On January 25, 2022, Mercado filed his second Motion for a New Trial, and additionally filed a Motion for Post-Conviction Discovery. By this latter motion, Mercado sought evidence of any threats, promises, rewards, and inducements offered to Cripps, Martinez, Barros, Destefano, and/or Gomes by the Plymouth County District Attorney's Office ("PCDAO"), the Brockton Police Department, and the Massachusetts State Police between 2000 and 2010; any information regarding past cooperation received from the Commonwealth's trial witnesses; and any information about prior assaults or assassination attempts on the Victim.

      The Commonwealth's response reflects that Rui Barbosa, Jair Barros, Corrin Cripps, Michael Gomes, Janette Martinez, and Robert Tratzinski had no Superior Court cases. Destefano had two Superior Court cases pending in 2009 for trafficking in cocaine as a subsequent offense. Those cases were disposed of by guilty plea on August 26, 2009, and the

--------------------------------------------

[3] The Court affirmed the guilty verdicts of murder in the  first degree based on deliberate premeditation and extreme atrocity or cruelty. but vacated Mercado' s conviction for felony murder on account of evidentiary insufficiency. See Mercado, 466 Mass. at 154-55.

-13-

underlying files indicate that Destefano did not receive any promises, rewards or inducements for his change of plea. Barros had two juvenile cases involving indecent assault and battery on a child. One case was disposed of in 2001 by community service and dismissal. The other went to trial in February of 2000, but no further information is available. No District Court cases for any of these witnesses were available, as such cases are only retained for one year for dismissed cases and four years for convictions (except sexual assault cases, which are retained for 35 years).

       The PCDAO searched its DAMON case management system, and could not find any information about Antonio Frazier.[4] The PCDAO also searched DAMON for cases in which David Gomes was a victim or witness but not a defendant, and found only one such case: a 1999 District Court case involving an assault and battery with a dangerous weapon. However, it is unclear whether David Gomes was a victim or a witness in that case, and the case file has since been destroyed in compliance with the Secretary of State's Statewide Records Retention Schedule. The PCDAO produced an October, 2002 Brockton Police report about an incident in which the Victim stated he was attacked by three men because of his role as a witness in a homicide prosecution against Manuel Gomes. In addition, the PCDAO produced a June 21, 2005 Brockton Police Department report about a non-fatal shooting of the Victim. The Massachusetts State Police Detective Unit produced records about the Waverly Street shooting. And the Brockton Police Department produced numerous reports regarding the Victim, Destefano, Martinez, Barros, Gomes, Frazier, and Cripps.

--------------------------------------------

[4] Frazier was shot in a December, 2005 incident outside of Sammy's Bar in Brockton, where the Victim was then present. Frazier believes that the Victim was the intended target of th is shooting.

-14-

      Finally, Mercado filed a Motion for Post. Conviction Discovery of Internal Affairs Records on Trooper Clements. The Commonwealth produced the only report in the possession of the PCDAO: a Massachusetts State Police Division of Standards and Training report concerning Trooper Clements' testimony in a different criminal case, Commonwealth v. Ware, which testimony was found not to be sustained.[5] On March 1, 2022, the Court (Sullivan, J.) allowed Mercado's Motion for Funds for an eyewitness identification expert.

FINDINGS OF FACT

      Following an initial review of Mercado's Motion for New Trial, the undersigned detennined that the motion raised sufficiently substantial issues and presented an adequate factual proffer in support thereof to warrant an evidcntiary hearing. Accordingly, on March 23 and 24, 2023, the Court held a hearing addressed to the issues raised in the motion. The Defendant called seven witnesses (Cripps, Destefano, Martinez, Antonio Frazier, Dr. Nancy Franklin, Daniel Collins and Victoria Kelleher, Esq.[6]) . The Commonwealth called one witness (Detective George Almeida, Brockton P.D.). There were 29 documentary exhibits introduced. The Court's findings of fact, drawn from the evidence that the undersigned credits and the reasonable inferences therefrom, follow.

Joseph Destefano

      Destefano testified at hearing that he falsely asserted to the police during his initial post- shooting interview that he had seen Mercado with a gun on the night of the Victim's murder, and

--------------------------------------------

[5] See Commonwealth v. Ware. 482 Mass. 717,726 (2019)(finding that Trooper Robert Clements gave testimony in murder trial that was"blatantly false and pertained to a critical component of the Commonwealth's case," and that his false testimony about what the defendant had stated during police interview about where he was picked up on the night of murder was likely to have influenced jury's verdict).

[6] Advised that trial counsel was refusing to cooperate in Mercado's Motion for New Tria1, the Court (Gordon, J.) allowed a Motion for Funds so that Attorneye Kelleher could testify for the Defendant as an expert witness.

-15-

that he had left the Martinez apartment because he did not want to be part of any robbery. Destefano maintains that these assertions were untrue, and that he only made them because he felt pressured by the police (who threatened to tic him to the murder and have him "go down for it" along with Mercado unless he cooperated). Destefano claims that Brockton P.O. Detective George Almeida pressed him to say that he saw a revolver in Mercado's waistband, and then, at the grand jury, urged him to "stick with [his] story and everything will be fine."

      The undersigned docs not credit the accusation that Detective Almeida made the threats attributed to him by Destefano. Destefano is a convicted felon and admitted prevaricator, who now professes to have lied both to the police and then again under oath to the grand jury. Destefano further signed an affidavit for submission to the Court, ''under the pain and penalties of perjury,'' which affidavit contains what he acknowledged at hearing to be material misstatements of fact (viz., in paragraphs 3 and 8 thereof). Destefano's claim that Detective Almeida pressed him to say that he saw a revolver in Mercado's waistband is likewise belied by the fact that Almeida, a highly experienced homicide detective in charge of the Gomes investigation, was aware that the crime scene only displayed shell casings from a semi-automatic weapon. It is more than implausible that Almeida would have pressed Destefano to claim to have seen Mercado (the supposed target) with a gun that he (Almeida) knew could not have been the murder weapon.

      Further undermining Destefano's credibility are the material inconsistencies in his hearing testimony. For example, Destefano maintained at hearing that he was in the building at the time of the Victim's murder and heard gunshots. At the grand jury, however, Destefano. denied having heard gunshots, and claimed that he only learned of the shooting the following day. In his pre-hearing affidavit, Destefano alleged that Detective Almeida repeatedly harassed

-16-

him, including by following him. At hearing, however, Destefano testified only that he observed Detective Almeida outside of his apartment building on a single occasion. Finally, Destefano's recollection of his communications with Mercado shifted. In his pre-hearing affidavit, Destefano asserted that he wrote Mercado a letter in which he urged Mercado to send a private investigator to sec him. At hearing, by contrast, Destefano alleged that he made this suggestion orally to. Mercado for the first time in 2008, while the two were being held in the Plymouth County House of Correction.

      For all these reasons, together with the undersigned's observation of this witness's generally evasive appearance and behavior at hearing, Destefano lacks credibility. He could have initially inculpated Mercado because he in fact did sec what he claimed to have seen, and then recanted such testimony before the Court for any number of reasons (e.g., that he was fearful of Mercado and those associated with him).7 Or Destefano may have simply misconstrued unexceptional exhortations by the police to cooperate in their investigation or risk suggesting by silence that Destefano himself was involved in the murder. Regardless, this witness's hearing testimony does not persuade the Court that Detective Almeida coerced Destefano to lie to the grand jury, and lends no corroboration to the charge that Almeida threatened Martinez to do so as well. The Court instead credits the directly contrary testimony of Detective Almeida, who credibly denied ever having pressured either of these witnesses to give false testimony.

      The Court further observes that Destefano did not testify at the trial; and even the testimony he now insists is the truth -viz., that he never saw Mercado with a gun and never

--------------------------------------------

[7] The Defendant's insistence that the only explanation for Destefano's recanting testimony at hearing is the notion that Destefano carries a guilty conscience for having given false grand jury testimony is plainly not so. Destefano took a contempt charge at the time of trial rather than testify against Mercado as summonsed, leaving him with little reason to feel remorse over the murder conviction that followed. Instead, Destefano may have then felt (and now feel) afraid of a potentially freed Mercado, prompting him to lend fear-borne support to Mercado in the present challenge to his incarceration.

-17-

overheard him discussing a plan to rob rival drug dealers - would not have been significantly exculpatory. After all, Destefano claims to have been with Mercado just three minutes on the evening of February 6. For him not to have seen Mercado with a gun or overheard any reference to a robbery during so limited a time frame does not undermine the substantial evidence at trial that did incriminate Mercado in these respects. In short, nothing deserving of credence presented to the Court by Destefano at hearing suggests either police misconduct or an injustice to Mercado.

Janette Martinez

      At hearing, Martinez testified that Brockton P.D. detectives questioned her aggressively at the police station shortly after the Gomes shooting; and she claimed - in response to leading questions from defense counsel - that at some point she was told by police that she could lose her children and her apartment. Martinez did not, however, testify that the police ever specifically pressed her to incriminate Mercado, or ever linked a failure to do so to a threat to lose her children or her apartment. In this respect, what Martinez asserted at hearing was essentially consistent with her trial testimony. To wit, Detective Almeida repeatedly urged, in the face of her obvious nervousness and fear, that Martinez tell the truth or risk being charged with drug crimes that could result in the loss of her children and housing. Aggressive though Detective Almeida may have been, the Court does not accept the contention of defense counsel that Martinez was thus pressured with threats of prosecution to incriminate Mercado falsely. Nor docs the Court construe the testimony of Martinez (at trial and again at hearing) that Detective Almeida's urging her to " tell the truth" represented some kind of police code to incriminate Mercado even if it were not the truth. Once again, the Court credits the contrary testimony of

-18-

Detective Almeida, who credibly denied ever having made or implied such threats to this or any other witness.

      At hearing, Martinez did testify that she never saw Mercado with a gun (his hands were always "in his pockets"), and never overheard Mercado discussing a robbery. This testimony obviously contradicts facts to which Martinez testified at the grand jury and again at trial. The Court, however, finds Martinez's hearing  testimony to be undeserving of credence. Martinez is an admitted crack addict with a diagnosed and highly medicated mental illness. Martinez displayed an inability to recall virtually anything of what was said between her and the police during their post-shooting interviews, and remembered almost nothing about her subsequent testimony before the grand jury and at trial. Much of this contemporaneous testimony was highly incriminating of Mercado. Martinez thus professed to have no recollection of telling police officers that she was afraid to come forward because she feared Mercado; did not remember telling the police that she had witnessed Mercado with a black handgun on the evening of the shooting; and did not recall telling investigators that she had overheard Mercado discussing a planned robbery. Tellingly, Martinez did not adopt much of what she asserted in the affidavit filed by counsel supporting Mercado's Motion for New Trial, an affidavit written in English that Martinez conceded at hearing she did not even understand. Martinez did, however, acknowledge authoring the real-time and more detailed statement written in her own hand in 2006 (Ex. 3), in which statement Martinez asserted that she had overheard. Mercado and Pelon discussing that they were going to "kill the kid."

      The undersigned has considered all of the circumstances surrounding Martinez's inconsistent and self-contradicting statements. Particularly in light of her impaired mental condition, concededly compromised memory, and forthright acknowledgment that she fears

-19-

Mercado, the Court is not prepared to credit the partial recantation of Martinez's trial testimony relied upon by the Defendant in his motion.[8] Moreover, and implausible recantation aside, Martinez's un-recanted testimony still places Mercado at the scene of the Victim's murder, still has Mercado standing in the apartment hallway at the precise time that gunfire erupts, and still has Mercado discussing with Pelan the possible killing of the Victim (a rival drug dealer) shortly prior to the shooting. Taken together, the evidence put forward by Martinez neither exonerates Mercado nor suggests that justice miscarried in his conviction.

Antonio Frazier

      Antonio Frazier offered little to nothing in the way of probative evidence at hearing. Frazier merely described a scene, substantially prior to the Victim's homicide, in which he and four other persons were shot at outside of Sammy's Bar in Brockton. The shooter fired his (or her) weapon from across the street, wounding members of a group of five bar patrons that included both Frazier and the Victim. Frazier (who acknowledges he was intoxicated at the time) speculates that the Victim was the true target of this shooting; but Frazier conceded on questioning from the Court that he has no actual basis for such an opinion. Five people in all were actually shot, none of them the Victim; and any or none of them could have been the intended target.[9] Frazier's testimony in no way tends to exonerate Mercado in respect to the Victim's murder.

--------------------------------------------

[8] The Court specifically rejects the contention that Martinez had no reason to make untrue statements to the Court at hearing, something this witness has done repeatedly.

[9] The Court further observes that the assailant in this episode was never identified. If one credits the rank speculation that the Victim was the target of the shooting at Sammy's Bar, one might equally speculate that Mercado was the shooter.

-20-

Corrin Cripps

      The Court received live testimony from Corrin Cripps, having been led to believe (from Defendant's initial filings in support of this motion) that Cripps would testify to having been coerced with undisclosed promises and inducements to implicate Mercado in a murder of which "she always thought [him to be] innocent." The testimony Cripps provided at hearing, however, did no such thing.

      As a threshold matter, the Court states that it is simply not prepared to find that the PCDAO that prosecuted Mercado to conviction committed material Brady violations in its pretrial discovery on the basis of Cripps' hearing testimony. Cripps is an admitted drug-user with an extremely poor recollection of the relevant events. Some of these events took place more than 20 years (and all of them well more than a decade) ago. Cripps' testimony, therefore, was exceedingly vague and riddled with factual holes. And in certain important respects, her testimony about having received benefits from the state ( viz., enrollment in a sober house, and being provided food, cigarettes, and the like) in connection with her cooperation in its investigation of a rape of Cripps by Brian Knipper cannot be squared with the documented evidence of these events. At hearing, Cripps maintained these benefits were provided to her at or near the time of the Knipper rape when she was also in Massachusetts to testify before the grand jury investigating the Victim's murder. The criminal records introduced at hearing, however, show that the Knipper rape and investigation occurred in 2003, years before Cripps' appearance before the Mercado grand jury in 2006.

      Such contradictions notwithstanding, the Court infers that the drug treatment referenced by Cripps did occur in the context of the present case. During her grand jury testimony on March 3, 2006, Cripps testified that she lived in Brockton. During her grand jury testimony on March

-21-

10, 2006, however, Cripps testified that she lived in Falmouth, was getting treatment, and was one week sober. The prosecutor then asked her about the treatment: "The District Attorney's Office helped you contact the people that you needed to talk to, is that right?"; to which Cripps replied, " Yes." [10]

      Even if the Court were inclined to repose more confidence in the recollections of Cripps, and it is not, the matters to which she testified at hearing were insubstantial and would not have provided the defense with material bases on which to impeach her trial testimony. For example, Cripps testified that, at the time of her appearance at the Mercado trial, the state had paid for her transportation from Florida and was housing her for a week in a hotel. This testimony is corroborated by post-conviction discovery from the PCDAO showing approved witness expenses of $300 in air fare to fly Cripps from Orlando to Boston on 6/18/09 and back to Orlando on 6/27/09, a six-night hotel stay, meals for six days at $30 per day, and a taxi providing Cripps
with round-trip transportation to and from the airport. Cripps likewise testified that an open warrant for a violation of probation never resulted in an arrest or surrender proceeding. Even if these facts are true, however, they fall far short of casting any serious doubt on the truthfulness of Cripps' trial testimony. Cripps volunteered at hearing that she was never offered anything from the PCDAO or the police in exchange for her testimony; and there is no evidence in the record that Cripps was ever threatened or coerced in any way to incriminate Mercado.[11] Perhaps most tellingly, Cripps never recanted any aspect of her trial testimony, in which she both placed

--------------------------------------------

[10] It appears that the Commonwealth failed to disclose this benefit in response to defense counsel's motion for promises, rewards and inducements. Nevertheless, it is evident that defense counsel would have learned of the benefit simply by reviewing the minutes of Cripps' grand jury testimony that he did possess.

[11] The unadorned fact that Cripps was not called to account on her open warrant lends no support to the contention that prosecutors provided Cripps with this "inducement" to procure incriminating testimony against Mercado. Cripps herself suggested no such connection, and any number of more plausible reasons could explain the non- prosecution of a probation violation.

-22-

Mercado at the scene of the Victim's murder and attached to him a motive for the shooting (viz., his conveyed intent to rob a rival drug dealer). Nothing in Cripps' hearing testimony, therefore, provides the Court with any basis to believe that her inculpation of Mercado at trial was anything other than the truth.[12]

Nancy Franklin

      Nancy Franklin was an Associate Professor of Psychology at Stony Brook University in New York for 30 years. She retired in 2019, and now consults in criminal cases. Dr. Franklin has a B.A. in Psychology from the University of California, Santa Barbara and a  Ph.D. in Psychology from Stanford University. She specializes in the areas of cognition, memory, and memory errors, an expertise that extends to the subject of eyewitness identification. Dr. Franklin has given expert testimony on eyewitness identification and memory in more than 80 cases in several states, including Massachusetts, New York and Connecticut. The Court finds that Dr. Franklin is qualified to testify as an expert on the subject of memory and eyewitness identification.

      Dr. Franklin reviewed excerpts from the grand jury minutes and trial testimony, various police reports, the photo arrays and instructions given to Michael Gomes and Corrin Cripps, and the affidavits of Mercado, Janette Martinez, Joseph Destefano, Daniel Collins, and Attorney Codagnone. Although she performs a majority of her work pro bona, Dr. Franklin will receive the standard Committee for Public Counsel Services ("CPCS") hourly rate of $180 for her work
in this case.

--------------------------------------------

[12] Indeed, if Cripps were looking to incriminate Mercado with perjurious testimony. she could easily have alleged that she felt a gun in his waistband at the time she and Mercado hugged when they first encountered one another on the night of the Gomes murder. But despite being ask ed this very question on direct examination, Cripps expressly denied feeling an y sort of weapon on Mercado's person. This wasclearly not the testimony of someone seekingto incriminate Mercado, whelhcrto curry favor with police authorities or otherwise.

-23-

      Dr. Franklin testified that research into eyewitness identification and memory began in the 1970s, and "hit its stride" in the 2000s. Although a substantial amount of research had been conducted in this area prior to Mercado's trial in 2009, there has been a very significant expansion of the research since then. It is now scientifically understood that human memory does not operate like a video camera or other electronic recording device, as both the informational encoding and recall processes of the mind are flawed. People routinely retrieve factual details that were successfully encoded in the brain based on percipient experience, even as they recall non-experienced details that are ''filled in" by inference and incorporated from other external sources. This phenomenon of memory reconstruction creates a substantial risk that errors of fact will be introduced into a recollection. The accuracy of an eyewitness identification depends on how well the memory of a person's face is initially encoded, as well as whether and to what extent there are post-event influences brought to bear on that memory.

      Dr. Franklin opines that numerous factors present in this case compromise the reliability of the three eyewitness identifications (Gomes, Martinez and Cripps) of Mercado. Impactful on all three identifications is the effect of delay, as people tend to forget the nuances of a face over time. The most reliable memory is an eyewitness's recollection immediately after the happening of an event. Memory decays over time, with some studies showing that memory loss begins within one week following the subject event. Replaying a memory in one's mind can increase one's confidence in the memory, but it does not necessarily increase the accuracy of the memory itself.

      Relevant to the Gomes identification of Mercado is the difficulty of  accurately identifying a stranger, i.e., an unfamiliar face. Laboratory studies have shown that, even under optimal viewing circumstances, the correct identification of a stranger occurs only 50-70% of the

-24-

time. In addition, the length of a witness's opportunity to view the suspect's face affects reliability, and Gomes had only a brief exposure to Mercado. The generality of Gomes' initial description of the suspect during his 911 call suggests that he had only a limited opportunity to observe the details of the suspect's appearance. Also relevant to the Gomes identification is the angle of his observation, as a profile view of a suspect correlates with increased unreliability. Further, the presence of a weapon, such as in the present case, tends to reduce an eyewitness' s focus and attention on the suspect's face. Another factor compromising the Gomes identification is partial disguise, such as a hood covering the suspect's hair like the one worn by Mercado. Such a head covering will impair identification reliability, because the processing of strangers' faces depends largely on their hair and hairline.

      Dr. Franklin further observes that post-event influences such as police interactions can affect memory. With respect to the identification by Michael Gomes, use of a non-blind identification procedure, in which either the administrator or someone else present during the photo array knows the target suspect's identity, creates a risk of contamination through deliberate or unconscious signaling. In addition, Gomes was exposed to Mercado's face both during the photo array and during the Court's subsequent immunity hearing, exposures that could have produced a sense of familiarity triggering false memory. Gomes' failure to pick Mercado out of the original photo array is likewise diagnostic of the unreliability of his in-court identification of Mercado at trial three years later. In sum, and applying evolved eyewitness science, Dr. Franklin opines that the totality of the circumstances suggests that Michael Gomes' identification of Mercado as the shooter of the Victim is unreliable.

      Dr. Franklin reaches a similar conclusion with respect to the eyewitness identification of Mercado given by Corrin Cripps. Dr. Franklin opines that compromising factors implicated in

-25-

the Cripps identification are her brief viewing opportunity, the fact that other people were present in the hallway, and the hood that covered this suspect's hair. In addition, Cripps' identification is rendered questionable by her serious and prolonged substance abuse, which Dr. Franklin notes can affect one's ability to form and encode memories. Cocaine use in particular impairs perception and memory by affecting both the temporal lobe, where memories are formed, and the frontal cortex, the portion of the brain responsible for judgment and cognitive functioning. Cocaine use likewise reduces the level of detail that gets encoded in the brain, leaving gaps in memory that are susceptible to post-event suggestion. The long-term use of cocaine also damages the structure of the brain, and thereby impacts perception and the formation of memory. The reliability of Cripps' identification may also have been compromised by inducements such as immunity from prosecution, and the benefit of receiving drug treatment, cigarettes, a hotel stay, and meals. All told, Dr. Franklin opines that the totality of the circumstances suggests that Cripps' identification of Mercado as the man standing in the hall immediately before the shooting of the Victim is unreliable.

       Finally, Dr. Franklin asserts that the reliability of the eyewitness identification of Mercado by Janette Martinez is undermined by Martinez's contradictory statements about where she was during the shooting and what she actually saw at that time. In Dr. Franklin's view, Martinez is "by definition" unreliable, raising substantial doubt as to her initial memory of the suspect. In addition, viewing the suspect through a peephole likely had a distorting effect on the facial detail that Martinez observed. Martinez's reliability as an observer is also called into question by her crack cocaine use on the evening of February 6, her status as a long-term drug addict, and the fact that she was then on an anti-psychotic medication, a substance with a sedating effect that depresses attention and increases one's vulnerability to post-event

-26-

suggestion. Dr. Franklin further indicates that inducements such as immunity from prosecution and coercion (such as through police threats) can affect reliability. (However, as discussed ante, the Court finds that Mercado has not demonstrated that Martinez's identification was in fact influenced by threats from the police.) Finally, Dr. Franklin opines that Martinez's recent (partial) recantation of her identification is indicative of the overall unreliability of her original memory of the suspect.

Victoria Kelleher, Esq.

      Attorney Victoria Kelleher graduated from Northeastern Law School in 1997, and passed the Massachusetts bar in 1998. After working as a general practitioner for a year, she spent the next nine years working for CPCS on felony cases. Kelleher then went into private practice, performing mostly criminal defense work. Kelleher is on the CPCS murder list as well as the federal criminal defense list. Kelleher has tried some 35 to 40 Superior Court cases, but only five murder cases. She is the immediate past president of the Massachusetts Association of Criminal Defense Lawyers, and for the past eight years has been a supervising attorney for Suffolk Lawyers for Justice. Kelleher has conducted 40 to 50 trainings, including trainings on homicide, eyewitness identification, and the use of experts. She is familiar with the standards that governed the practice of criminal defense attorneys in 2009.

      Attorney Kelleher opines that, in every homicide case, counsel should hire a private investigator to interview witnesses and examine, measure and photograph the crime scene. In the present case, Kelleher would have retained an investigator to interview the eyewitnesses and obtain their criminal and medical records, particularly as they bore on matters of mental health and drug addiction. In addition, she would have directed the engaged investigator to question witnesses, obtain police reports, and review grand jury minutes with respect to the prior shooting

-27-

of and attacks on the Victim, David Gomes, with an eye to developing a third-party culprit defense. Kelleher maintains that the failure to conduct this type of investigation and thereby obtain relevant discovery fell below the standard of competence expected from qualified defense counsel trying a murder case circa 2009.

      Attorney Kelleher likewise testifies that she would have retained an investigator to determine the identity and criminal history of, and interview, the individual whom Michael Gomes initially selected in the photo array. Kelleher would have attempted to develop a case for that individual as a potential third-party culprit, and then pursued a Bowden defense based on the failure of police to investigate him. In addition, Kelleher would have thoroughly investigated any promises, rewards and inducements that may have been given to Cripps, Martinez and Michael Gomes. Kelleher maintains that the failure of Mercado's trial counsel to do this amounted to a failure of competent representation.

       Finally, Attorney Kelleher opines that defense counsel in this case should  have consulted with an expert to challenge the prosecution's eyewitness identification evidence. In Kelleher's view, there is never a ''downside" to working with an expert; and, in the present case, she would have consulted with an eyewitness identification expert, a memory expert, and/or a neurologist. In the 2006 to 2009 time frame, courts were just beginning to grapple with the admissibility of expert testimony on eyewitness identification. However, even if an identification expert ultimately did not testify at trial, consultation with such an expert would have benefitted the defense by educating counsel on potential pathways for cross-examination of the incriminating eyewitnesses. Once again, Kelleher opines that the failure of trial counsel to obtain this type of expert evidence fell below the standard of competent representation in a murder case.

-28-

      Although the undersigned intends no disrespect to Attorney Kelleher, who is an estimable criminal defense lawyer, her testimony provides little in the way of probative support to Mercado's contention that he received ineffect ive assistance from trial counsel. Kclleher's views are addressed to a legal judgment reserved exclusively to the sound discretion of the Court; and what she believes a qualified trial attorney defendinga murder client in 2009 would or would not have done to develop a defense is of only modest value to the Court's analysis in this regard.[13]

Daniel Collins

      Private investigator Daniel Collins visited 88 North Main Street in Brockton in March of 2021, and at that time entered apartment number 2-1 (the Victim's apartment) to take a view. Collins downloaded an aerial image of the building from Google Maps, and, while walking around the building, drew his own markings of the apartment and stairwell locations (which are not to scale) on that image. Collins was unable to enter apartment number 2-7, Martinez's residence, in 2021, but did take exterior photographs from apartment 2-1 and the hallway.

      On March 24, 2023, Collins received access to apartment 2-7 from Susan Moore, the current manager of the building. Collins looked through the peephole of the door to apartment 2- 7 facing the hallway, and observed a somewhat distorted view that becomes increasingly out of focus toward the edges. The stairwell door is not visible from this angle, although part of the wall close to the comer is. There is no admissible evidence before the Court, however, bearing on whether the door and peephole existing on February 6, 2006 is the same door and peephole that exists today. Collins opines that the layout he observed in 2023 appears similar to the layout

--------------------------------------------

[13] The Court would naturally have benefitted from receiving testimony from Mercado's trialc ounsel, Attorney Galibois. But the Defendant neversummonsed him10 appearat bearing; so what Attorney Galibois did and failed to do by way of investigation (and why) remain a mystery. ·
-29-

in the pictures he took in 2021. Once again, however, ownership of the building has changed at least twice since 2006, and it is unknown whether the layout of the building today is in fact the same as the layout circa February, 2006.

      In these circumstances, the Court cannot credit either Collins' opinions or the hearsay affidavit of Susan Moore upon which he professed at hearing to rely. Such evidence is not competent or substantially probative.

RULINGS OF LAW

      Pursuant to Mass. R. Crim. P. 30(b), the Court may grant a new trial if it appears that justice may not have been done. Commonwealth v. Eagles, 491 Mass. 210, 215 (2023); Commonwealth v. Lessieur, 488 Mass. 620, 627 (2021). The decision to allow a new trial lies within the sound discretion of the motion judge. Eagles, 491 Mass. at 215; Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021).

      In support of his present motion, Mercado has advanced a scattershot of disparate legal challenges. These contentions arc addressed in turn.

BRADY VIOLATIONS

      Mercado first asserts that he is entitled to a new trial because the Commonwealth withheld exculpatory evidence of threats, promises, rewards and inducements for Correia, Destefano, Gomes, Martinez and Cripps. Due process and Mass. R. Crim. P. 14 obligate a prosecutor to disclose exculpatory evidence in his/her possession, custody, or control or in the possession, custody, or control of any person who is subject to the prosecutor's direction or control. Commonwealth v. Caldwell, 487 Mass. 370,374 (2021); Commonwealth v. Sullivan, 478 Mass. 369, 380-81 (2017). Evidence that could be used to challenge the credibility or show

-30-

the bias of a key prosecution witness is exculpatory, and must be turned over. Commonwealth v. Tavares, 491 Mass. 362, 367 (2023); Caldwell, 487 Mass. at 375. Where specifically requested evidence is not disclosed, the defendant need only demonstrate a substantial basis for claiming prejudice to obtain a new trial. Caldwell, 487 Mass. at 375; Commonwealth v. Ferreira, 481 Mass. 641, 650 (2019). This requires a showing that the jury would have been influenced by the timely disclosure of the evidence at issue; that is, there is a "reasonable possibility that the undisclosed evidence would have made a difference." Ferreira, 48 l Mass. at 650.

      Mercado alleges that the Commonwealth failed to disclose that Martinez, Destefano and Correia were threatened by police into implicating him in the Victim's murder. However, the Court finds that Mercado has failed to prove that any of those individuals were in fact so threatened. See Commonwealth v. Schand, 420 Mass. 783, 787 (1995) (to prevail on due process claim, defendant must establish that exculpatory evidence existed). For the reasons recited ante, the Court does not credit Martinez's testimony that police threatened her into implicating Mercado. Although Martinez agreed at hearing, in response to leading questions, that police threatened to take away her apartment and children and to charge her with drug dealing if she refused to cooperate with them, Martinez did not expressly or even impliedly link such threats to any change or falsification of her testimony. To the contrary, Martinez repeatedly testified that police only pressed her ''to tell the truth," an exhortation the undersigned is unwilling to translate into a dog-whistled police threat that forced her to do the very opposite. Thus, the Court having credited Detective Almeida's testimony that Martinez was never subject to any manner of threat if she did not implicate Mercado in the Gomes shooting, Mercado has not established the existence of police coercion that the Commonwealth failed to disclose. Cf. Commonwealth v.

-31-

Ridge, 455 Mass. 307, 319-20 (2009) (court properly denied new trial motion where there was no credible evidence that prosecutor had undisclosed agreements with witness).

      The Court further observes that neither Correia nor Destefano testified at Mercado's trial. Accordingly, any undisclosed threats by police to those individuals could serve only to corroborate the claim of police coercion directed to Martinez, a claim the undersigned has expressly rejected. Correia did not testify at the evidentiary hearing, and the Court will not credit his hearsay affidavit. Further, and for the reasons detailed ante, the Court docs not credit Destefano's testimony that he was pressured by Detective Almeida to say that he saw Mercado with a gun. For these reasons, there is simply no credible evidence that the Commonwealth failed to disclose exculpatory evidence relating to police coercion, and Mercado has thus not demonstrated a due process violation warranting a new trial. See ante.

      Mercado additionally argues that the Commonwealth failed to disclose that, while cooperating in this case, Michael Gomes was the subject of three criminal cases in which he received favorable treatment from the government. See Commonwealth v. Rodwell , 394 Mass. 694, 700 (1985) (although past benefits from cooperation may show bias, pendency of criminal charges is much stronger source of motivation). Mercado was indicted on June 1, 2006 and tried in June of 2009. In the interim, on September 30, 2006, Gomes was arrested after Brockton Police officers observed him clench his fist and assume a fighting stance toward another man outside a bar on Main Street. However, there is no criminal docket for this matter. Thus, no competent evidence has been presented to the Court as to why this arrest did not result in charges; and, given the minor nature of the underlying incident, the Court cannot reasonably infer that it had anything to do with Gomes' grand jury appearance or his anticipated trial testimony.

-32-

      In addition, on November 1, 2006, Michael Gomes was charged in Brockton District Court with assault and battery; but that case was later dismissed on February 7, 2008 on account of the Commonwealth's failure to prosecute. Likewise, on January 20, 2007, Gomes was charged in Brockton District Court with violation of a Chapter 209A restraining order; but that charge was dismissed at a pretrial hearing on November 30, 2007. Once again, there is no evidence from either the prosecutor or defense counsel in those cases, or from any other source, as to why the charges were dismissed. The Court thus cannot reasonably infer from the dockets alone that the charge dismissals were in exchange for Gomes' cooperation in this case (as opposed, say, to the Commonwealth's simple failure to be ready for trial or some other routine reason).

      In short, there is no credible evidence that the Commonwealth failed to disclose exculpatory evidence relating to the treatment of Michael Gomes, and Mercado has not demonstrated a due process violation warranting a new trial. See Ridge, 455 Mass. at 319 (court properly denied new trial motion where there was no credible evidence that prosecutor had undisclosed agreements with witness). Cf. Commonwealth v. Fisher, 433 Mass. 340, 358-59 (2001) (where defendant did not show, beyond mere speculation, that witness was promised something in exchange for testimony, trial counsel was not ineffective in handling the issue of promises, rewards and inducements).

      Finally, Mercado argues that the Commonwealth failed to disclose promises and inducements purportedly given to Martinez and Cripps. Evidence that suggests preferential treatment of a key government witness in return for that witness's testimony is exculpatory, and must be disclosed by the Commonwealth prior to trial. Commonwealth v. Torres, 479 Mass. 641, 649 (2018). As found ante, however, Martinez did not testify at the evidentiary hearing that police ever promised not to charge her with drug dealing, and/or not to search her apartment for

-33-

evidence of crime, in exchange for testimony implicating Mercado. See Schand. 420 Mass. at 787 (to prevail on due process claim, defendant must establish that exculpatory evidence existed). What transpired, therefore, was not a promise or inducement for disclosure purposes.

      With respect to  Cripps, Mercado argues that the Commonwealth failed to disclose that she was not arrested on outstanding warrants, that she was arrested with drugs but released without charges, and that she received residential drug treatment, a hotel stay, meals and transportation.[14] The Court has found that the Commonwealth failed to disclose that. in connection with Cripps' testimony before the grand jury, the PCDAO arranged for her to receive drug treatment. In addition, the Commonwealth failed to disclose that, in connection with her appearance at Mercado's trial, Cripps was flown in from Florida and provided with hotel accommodations for six nights, meals, and transportation to and from the airport to the hotel. This does, to besure, qualify as exculpatory inducement evidence that was specifically requested by Mercado prior to trial. See Torres, 479 Mass. at 649 (evidence that suggests any beneficial treatment of key government witness in return for that witness's testimony is exculpatory, and must be disclosed by Commonwealth). Worrisomely, the Court has been provided with no explanation whatsoever as to why this evidence was not disclosed to defense counsel prior to trial.

      To obtain a new trial post-conviction, however, the Defendant bears the further burden to demonstrate a substantial basis for claiming prejudice by showing a reasonable possibility that the undisclosed evidence would have made a difference to the jury. Caldwell, 487 Mass. at 375;

--------------------------------------------

[14] The trial transcript reveals that the judge refused to allow defense counsel to impeach Cripps with the fact that she had an outstanding warrant out of Quincy District Court, but was not surrendered because she was in Massachusetts under summons (and therefore immune from process under the Uniform Law to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, G.L. c. 233,§§ l3A-13D). This alleged inducement, therefore. even if it could be considered such, was obviously disclosed to the defense.

-34-

Ferreira. 481 Mass. at 650. Taking all of the foregoing into fair consideration, the Court concludes that Mercado has simply not demonstrated a substantial basis for claiming prejudice from the prosecution's failure to disclose these benefits. Cripps was undeniably the least consequential of the three eyewitnesses at trial, having testified to little more than that Mercado was standing in the hall just before she heard gunshots coming from there. And the jury was well aware that Cripps was testifying under a grant of immunity, was a crack addict, and had criminal convictions. In addition, the jury was specifically instructed that they could consider a grant of immunity in assessing witness credibility, and that immunized testimony could not be the sole basis for a conviction. Evidence that the Commonwealth got Cripps into drug treatment during the grand jury proceedings, and paid for her air fare, hotel, meals and taxi travel during the trial, is at most cumulative of the prodigious other evidence used to impeach her; and such evidence furnishes no stronger basis for a motive to lie than the fact that Cripps had been immunized against prosecution for drug-related crimes in exchange for her testimony. See Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992) (cumulative evidence does not warrant new trial unless it is more credible than any other evidence on the same issue).

      In short, Cripps. who offered only corroborative evidence placing Mercado at the scene of the Victim's murder, was effectively impeached by defense counsel; and Mercado has not shown a reasonable possibility that knowledge of Cripps' receipt of drug treatment during her grand jury appearance and a hotel stay, meals, and provisions during the trial would have made any incremental difference to the jury in assessing her credibility. Compare Caldwell, 487 Mass. at 378-79 (where conviction rested on jailhouse informant's testimony that defendant confessed, Commonwealth's failure to disclose that informant had testified about jailhouse confession in another prosecution, hoping to gain favorable treatment, required new trial because it was the

-35-

strongest available basis for impeaching informant's credibility); Tucceri. 412 Mass. at 414 (where victim testified that rapist was clean-shaven, Commonwealth's failure to disclose arrest photograph showing defendant with moustache required new trial, because it was stronger and more reliable than trial testimony of defendant's wife that he had moustache and was not merely cumulative).

      For all of these reasons, Mercado has not demonstrated newly discovered exculpatory evidence through Brady violations warranting a new trial.

INEFFECTIVE ASSISTANCE OF COUNSEL

      Mercado next contends that he is entitled to a new trial because he received ineffective assistance of counsel. To analyze claimed ineffective assistance under art. 12of the Massachusetts Declaration of Rights, the Court's inquiry asks whether there has been serious incompetency, inefficiency or inattention on the part of trial counsel, conduct falling measurably below that expected from an ordinary fallible lawyer, and whether such dereliction likely deprived the defendant of an otherwise available and substantial ground of defense. Tavares, 491 Mass. at 365; Commonwealth v. Ng, 489 Mass. 242,250 (2022). Where the defendant seeks a new trial based on ineffective assistance of counsel, he bears the burden of proving a level of ineffectiveness that undermines confidence in the outcome of the trial. Ng, 489 Mass. at 249; Commonwealth v. Kolenovic, 47l Mass. 664, 673 (2015). The defendant must show that better work by counsel would have accomplished something material for the defense. Ng, 489 Mass. at 250. The Court finds the evidence put forward by Mercado insufficient to meet this standard.

Third-Party Culprit and Bowden Investigation

      Mercado first argues that trial counsel was ineffective in failing to conduct an adequate investigation into alternate suspects who might have killed the Victim. It is well settled that

-36-

defense counsel has a professional obligation to conduct an independent investigation of the facts, and to investigate all potentially substantial defenses. Commonwealth v. Diaz-Perez, 484 Mass. 69, 74 (2020); Commonwealth v.  . 474 Mass. 743, 758 (2016). Any decision either not to investigate or to limit defense investigation of a matter must be supported by reasonable professional judgment. Tavares, 491 Mass. at 366; Diaz-Perez. 484 Mass. at 74. See also . 474 Mass. at 758 (extent of necessary investigation depends on viability of potential defense relative to availability and strength of other potential defenses). "Absent a reasonable investigation, defense counsel lacks sufficient information to evaluate his or her strategic options and to make decisions in the best interests of the client.'' Diaz-Perez, 484 Mass. at 74.

      Failure to investigate the only realistic defense a defendant has, if the facts known to or available to counsel support that defense, falls below the level of competency expected from trial counsel. Commonwealth v. Alcide, 472 Mass. 150, 168 (2015). This may occur where counsel neglects evidence that another person committed the crime, and where such evidence, if developed, might have raised a reasonable doubt about whether the defendant or someone else killed the victim. Id. at 158. Standing alone. however, the simple act of not engaging a private investigator in a murder case will not suffice to sustain a claim of ineffective assistance of counsel. See Diaz-Perez, 484 Mass. at 74-75 (noting that duty to investigate may require drawing on investigator for help). To the extent that Attorney Kelleher's opinion at hearing can be construed to suggest otherwise, the Court does not credit it.

       To support his failure to investigate claim, Mercado cites the following evidence obtained during post-trial discovery. On August 28, 1999, Robert Amado pulled a bow and · arrow on the Victim during an argument, pointed it at him, and pulled back the string. On July 18, 2000, police observed that the Victim's vehicle had been shot at earlier in the evening; and

-37-

on July 19, 2000, the Victim was the initial suspect in the shooting death of Bruce Montrond. In October of 2002, the Victim called the police and reported that he had been attacked by three men because of his role as a witness in the homicide death of Manuel Resende. On November 14, 2004, three men shot at the Victim's girlfriend's car and lit it on fire . In March of 2005,
Valdir Andrade threatened the Victim at Texas Roadhouse, stating that they had a ..beef" and he would blaze the Victim's house. On June 21, 2005, the Victim was shot by an unknown gunman. And on December 2, 2005, two months before the Victim's murder, Antonio Frazier was shot outside of Sammy's Bar in Brockton while the Victim was working. Frazier testified during the hearing (without substantive basis) that he believes the Victim was the intended target of that shooting.

      Evidence that a third-party culprit committed the crime is admissible if the judge determines that it has a rational tendency to prove that another person had the motive, intent and opportunity to do so, is not too remote or speculative, and, if the evidence is hearsay, the judge determines that it will not tend to prejudice or confuse the jury and there are other substantial connecting links to the crime. Commonwealth v. Don, 483 Mass. 697, 711-12 (2019); Commonwealth v. Silva-Santiago, 453 Mass. 782, 800 (2009). The defendant must show that the acts of another person are so closely connected in time and method of operation as to cast real doubt on the proposition that the defendant was the person who perpetrated the indicted crime. Don, 483 Mass. at 712.

      Here, most of the evidence uncovered during post-trial discovery did not identify any specific individual with more than a generalized motive to harm the Victim, and did not connect any other suspect to the scene of his murder. Accordingly, this evidence fails to meet the standard of admissibility for third-party culprit evidence. See Don, 483 Mass. at 712. At most,

-38-

the evidence suggests that the Victim had violent enemies. Perhaps lots of them. But the cited incidents identify no one with any opportunity to commit the February 6 shooting; point to no one with the particularity required to allow the jury to identify an alternate perpetrator beyond speculation; and reflect no connecting links (e.g., circumstantial similarities in time, place and/or manner of killing between the facts of the incidents and the Victim's murder) to give rise to a reasonable third-party culprit theory of the crime.[15] Such evidence would thus not have been admissible at trial. See Commonwealth v. Andrade, 488 Mass. 522, 533 (2021) judge properly excluded evidence that rival gang members lived in general area of shootout, where their involvement was speculative at best, there was no evidence such individuals were near scene of murder, and there was no evidence that anyone other than defendant was seen holding a gun); Commonwealth v. DePina, 476 Mass. 614,629 (2017) (judge properly excluded evidence that, shortly before victim was murdered, unknown assailant assaulted victim with brick where such evidence was not relevant in the absence of connecting links to homicide); Commonwealth v. Scott, 470 Mass. 320, 328 (2014) (judge properly excluded evidence that named individuals bore ill will toward victim and had possible motive to kill him, where there was no evidence they had intent or opportunity to commit the indicted crime); Commonwealth v. Bright. 463 Mass. 421, 441 (2012) (judge properly excluded evidence that unidentified gang members might have wanted to harm victim, because evidence did not point to any particular third party who might have committed the crime and presented only speculative motive).

--------------------------------------------

[15] Most of these incident s occurred years before the Victim's murder, and none of the involved persons have ever been shown to have any physical proximity to the site of this homicide. The referenced incidents likewise bear few factual similarities to the February 6 shooting of the Victim. Some involved shootings at a car; others involved threatened or attempted arson; others took place in public venues; and one even involved the use of a bow and arrow. Beyond the singular fact that the Victim appears to have been the object of these episodes of violence, over a period spanning nearly a decade nothing connects the incidents to eachother or to this case in any coherent way that would be probative of a third-party culprit defense.

-39-

      Even if it had been admitted at trial, such remote and speculative evidence is unlikely to have swayed the jury. See Don, 483 Mass. at 712 (vague reports that victim had reputation for short-changing d rug dealers and being an informant amounted to no more than evidence of unidentified third parties with generalized motive to harm victim, and was unlikely to have swayed jury). Because Mercado has not demonstrated that he had a viable third-party culprit defense, trial counsel's alleged failure to investigate same does not amount to ineffective assistance warranting a new trial.[16] Cf. Tavares, 491 Mass. at 368 (new trial warranted where counsel failed to investigate and use proffer by confidential government informant that identified specific third party as shooter, corroborating defend ant' s mistaken identity claim); Alcide, 472 Mass. at 162-63 (new trial warranted where counsel failed to use witness descriptions of shooter matching alternate suspect but not defendant and such suspect's girlfriend's statement that ..my man shot somebody" to support third-party culprit defense).

      Mercado relatedly argues that trial counsel was ineffective in failing to investigate these prior incidents and use them to bolster a Bowden defense. A defendant may introduce evidence that police failed to pursue leads that a reasonable investigation would have followed in ord er to create an inference that the investigation was inadequate or unreliable, and that a proper investigation might have led to significant evidence of his innocence. Commonwealth v. Wood, 469 Mass. 266,277 (2014). In connection with a Bowden defense, a defendant may seek to • demonstrate to the jury that police learned of potential third-party culprits during their investigation, but failed to act reasonably on that information. Commonwealth v. Holbrook, 482 Mass. 596, 609 (2019). As discussed, ante, however, most of the prior incidents cited involved

--------------------------------------------

[16] Mercado has likewise not shown any prejudice from counsel's failure to investigate the individual selected by Michael Gomes in his photo array. This person's identity remains unknown, and there bas been no showing that he would have been a viable third-party culprit of the Gomes murder.

-40-

unknown assailants, and were remote in time and dissimilar in circumstances from the Victim's murder. There is likewise no probative evidence in the record that Brockton police had any basis for believing that the Victim was the target of Antonio Frazier's December 2, 2005 shooting outside Sammy's Bar; and Frazier's contrary speculation at hearing supplies none. At trial, the jury did learn from Jair Barros that the Victim had enemies, and had been shot after testifying in a murder case; and defense counsel did argue in closing that this evidence reflects that police failed to conduct a thorough investigation. But Mercado has not demonstrated that counsel's failure to discover and utilize other prior incidents to support a Bowden defense deprived him of a substantial ground of defense such as would warrant a new trial. See Ellis, 475 Mass. at 480 (noting that it is the rare case in which newly discovered Bowden evidence alone would require new trial).

Eyewitness Identification Expert

      Mercado next contends that counsel was ineffective in failing to consult with and introduce at trial an expert on eyewitness identification. It has long been recognized that the failure to introduce expert testimony into evidence constitutes ineffective assistance where such testimony could have provided a substantial ground of defense. Jacobs. 488 Mass. at 606; Commonwealth v. Haggerty, 400 Mass. 437, 440-41 (1987). However, it is not ineffective assistance of counsel to forego an eyewitness identification expert where, at the time of trial, such species of expert opinion was still being developed and was not commonly introduced into contested judicial proceedings. See Commonwealth v. Kirkland, 491 Mass. 339, 356-57 (2023) (noting that, when defendant was tried in 2013, use of eyewitness identification expert was not common). See also Commonwealth v. Gomes, 478 Mass. 1025, 1026 (2018) (in case involving

-41-

2011 crime, trial counsel's failure to introduce expert testimony to establish generally accepted scientific principles underlying eyewitness identification "can hardly be deemed incompetent").

       Although a substantial amount of research had been conducted on the subject of eyewitness identification prior to Mercado•s trial in 2009, there has undeniably been a significant expansion of such research since then. Indeed, it was not until 2013 that the SJC Study Group issued its Report and Recommendations on Eyewitness Evidence, and not until 2015 that th Court promulgated a provisional model instruction incorporating scientific principles to assist the jury in evaluating and weighing eyewitness identification testimony. See Commonwealth v. Ayala, 481 Mass. 46, 64 n.20 (2018); Commonwealth v. Gomes, 470 Mass. 352, 376-77 & Appendix (2015). Accordingly, counsel cannot be deemed to have performed in a manner falling measurably below that expected from an ordinary fallible criminal defense attorney for failing to consult with an eyewitness identification expert in the 2006 to 2009 time frame, many years before the use of such expert evidence had become normative in criminal cases. See Ayala, 481 Mass. at 64 n.20 (noting that, in 2009, retention of experts on eyewitness identification was not prevalent). To the extent Attorney Kelleher suggested otherwise during her hearing testimony. the Court does not credit such testimony.

Failure to Exclude In-Court Identification

      Mercado claims that trial counsel was ineffective in either failing to move in limine to exclude or to object in real time to Michael Gomes' in-court identification of him as the shooter. Where ineffective assistance rests on the failure to file a motion to suppress, the defendant must show both that the motion would have been successful, and that there was a reasonable possibility that the verdict would have been different without the excludable evidence. Commonwealth v. Walker, 460 Mass. 590, 599 (2011); Commonwealth v. Segovia, 53 Mass.

-42-

App. Ct. 184, 190 (200l ). In assessing the merit of a never-made motion to exclude Gomes' in- court identification, the Court applies the law existing at the time of trial in 2009. See Alcide, 472 Mass. at 165 (it is not ineffective assistance to fail to make objection that would have been futile under prevailing case law); Commonwealth v. Walker, 443 Mass. 867,873, cert. denied, 546 U.S. 1021 (2005) (in evaluating ineffective assistance claim, court considers state of law at time and not subsequent decisions).

      Prior to 2014, the SJC had not adopted any rule of per se exclusion for tainted or flawed in-court identifications. See Commonwealth v. Louis, 487 Mass. 759, 767 (2021); Commonwealth v. Crayton, 470 Mass. 228, 237-38 (2014).17 Rather, while recognizing that there is a degree of suggestiveness inherent in any identification of a suspect who is isolated in a courtroom, the SJC required exclusion of an in-court identification only if it was tainted by a prior out-of-court identification that was so impermissibly suggestive as to give rise to a substantial likelihood  of irreparable misidentification. Louis, 487 Mass. at 767; Crayton. 470 Mass. at 238; Commonwealth v. Carr, 464 Mass. 855, 877 (2013). See, .Alcide, 472 Mass. at 165-66 (it was ineffective assistance to fail to seek exclusion of in-court identifications by two witnesses, one of whom who was shown single photograph of defendant by district attorney prior to trial, and another who failed to pick defendant out of array but thereafter saw defendant's photograph in media article about the crime); Commonwealth v. Jones, 423 Mass. 99, 110 (1996) (in-court identification should have been excluded where it was tainted by witness's viewing of

--------------------------------------------

[17] In Crayton, the SJC announced a prospective rule, based on common law principles of fairness, that where an eyewitness has not participated in a pre-trial identification procedure, an in-court identification is allowed only if there is good cause for its admission. 470 Mass. at 24 l -43.,S££, also Commonwealth v. Collins, 470 Mass. 255,265 (2014)(prospectively applying good cause standard where, prior to trial, eyewitness made something less than unequivocal positive identification of defendant during a non-suggestive identification procedure).

-43-

Black defendant shackled to Vietnamese co-defendant in courtroom during pre-trial proceedings on multiple prior occasions).

      Here, it is unlikely that defense counsel would have succeeded in excluding Gomes' in- court identification of Mercado under the then-prevailing case law. At the time of Mercado's trial, suggestiveness generally went to the weight, and not the admissibility, of an in-court
identification. Louis, 487 Mass. at 767-68. Here, the photo array shown to Michael Gomes was not so impermissibly suggestive as to taint a later in-court identification.[18] Moreover, Gomes was cross--examined both on his failure to pick Mercado out of the photo array, as well as on the alleged statement to his brother that the assailants were Derek and Jay; and the jury was thus able to consider those facts in deciding what weight to give Gomes' in-court identification. See Commonwealth v. Bol Choeurn, 446 Mass. 510, 520 (2006) (counsel's failure to seek to exclude in-court identification was not ineffective assistance where, although witness selected photograph of different man during pre-trial photo array, there was no suggestion that array itself was improperly suggestive procedure, and counsel was able to argue mistaken identification by emphasizing to jury that photograph chosen was not defendant); Commonwealth v. Hudson, 2015 WL 2037025 at *5 (Mass. App. Ct. Rule 1:28), rev. denied, 472 Mass. 1102 (2015) (in- court identifications were admissible where observation of defendant at defense table during

--------------------------------------------

[18] Gomes viewed the array a week following the shooting, after giving only a vague initial description of the suspect to police. According to Dr. Franklin, the instruct ions read to Gomes before he viewed the array introduced bias in favor of making an identification by stating: "As you look at the person/array, tell me if you recognize him/her. If you do, tell me how you know the person and in your own words, how sure you are of the identification." In addition, the array administrator, Detective Almeida, was non-blind and asked Gomes to ••pick out the shooter." Gomes was not asked to report his confidence level These procedural flaws notwithstanding, Mercado has not shown that the photo array procedure utilized with Gomes was unnecessarily suggestive. Indeed, suggestiveness is obviously belied by Gomes' failure at that time to select Mercado. See Commonwealth v. Carter, 475 Mass. 512, 518 (2016)(absent evidence that officer who administered photo array signaled a particular response or otherwise tried to influence witness, failure to follow recommended procedures for arry goes to weight, not admissibility. of identification); Commonwealth v. Watson.475 Mass.512,518 (2016)(array was not unnecessarily suggestive merely because it was administered by investigating officer).

-44-

pretrial proceedings did not give rise to substantial likelihood of irreparable misidentification); Commonwealth v. Gagne, 27 Mass. App. Ct. 425, 428-29, rev. denied, 405 Mass. 1203 (1989) (in--court identification was admissible where jury informed that victim failed to identify defendant during show-up shortly after crime, and that procedure was not unduly suggestive). Finally, it bears note that Gomes was not the only eyewitness who implicated Mercado in the shooting, given the corroborating testimony of Martinez and Cripps. Compare Jones, 423 Mass. at 110-11 (reversing conviction based on improper admission of highly suggestive courthouse identification where there was no other eyewitness or physical evidence tying defendant to crime). Once again, therefore, Mercado has not demonstrated material ineffective assistance of counsel warranting a new trial.

Failure to Request DiGiambattista Instruction

      Mercado next argues that trial counsel was ineffective in failing to request a DiGiambattista instruction. See Commonwealth v. DiGiambattista, 442 Mass. 423, 447-48 (2004) (defendant, upon request, is entitled to instruction that there is a preference for recorded interrogation at place of detention, and jury should weigh unrecorded statement with great caution). Once again, however, Mercado has not shown that such an instruction would likely have influenced the jury's verdict.  See  Commonwealth  v.  Colon,  483 Mass.  378,393  (2019). The SJC determined on direct appeal that, even if the  admission  of  Mercado's  statement  was error, the statement did not create a substantial likelihood of a miscarriage of  justice given  the other strong evidence against him. See Mercado, 466 Mass. at 148-50. See also Commonwealth v. Vacher. 469 Mass. 425, 444 (20I4) (absence of instruction did not create substantial likelihood of injustice where, even if jury disregarded defendant's statement to police, there was

-45-

ample evidence to support conviction).[19] Accordingly, Mercado has not demonstrated that counsel's failure to request a DiGiambattista instruction constituted ineffective assistance of counsel warranting a new trial.

NEWLY DISCOVERED EVIDENCE

      Mercado alternately contends that, if the availability of eyewitness expert evidence was not so prominent in 2006 to deem a defense lawyer's failure to access it ineffective assistance, then he is entitled to a new trial based on the doctrine of newly discovered evidence. Mercado similarly maintains that testimonial recantation by Cripps and Martinez qualifies as newly discovered evidence requiring a new trial.

      Under Rule 30, a judge may order a new trial where newly discovered evidence casts real doubt on the justice of the conviction. Eagles, 491 Mass. at 215-17; Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 177 (2021). In this connection, the judge must determine whether the new evidence is material and credible, and whether it carries a sufficient measure of strength in support of the defendant's position. See Commonwealth v. Cowels, 470 Mass. 607, 617(2015); Commonwealth v. Shuman, 445 Mass. 268, 272 (2005). The judge decides not whether the verdict would have been different, but whether, in light of the totality of evidence presented at trial, the new evidence probably would have been a real factor in the jury's deliberations. See Commonwealth v. Ellis, 475 Mass. 459, 476-77 (2016); Cowels, 470 Mass. at 617.

--------------------------------------------

[19] Reinforcing the conclusion that Mercado was not materially prejudiced by the jury's failure to receive a DeGiambattista instruction, the Court notes that nothing from the police interview of Mercado in Puerto Rico that came into evidence at trial was ever disputed. To the contrary, Mercado took the witness stand, acknowledged both that he had adopted an alias and lied to the police when questioned about his identity, and then attempted to persuade the jury that none of this had anything to do with the Victim's shooting. Nothing in the interview testified to by Trooper Clements al trial, therefore, was prejudicial to Mercado, a fact further rendering the judge's failure to give a DiGiamhattista instruction of no moment.

-46-

Witness Recantations

      Mercado argues that Cripps' and Martinez's recantations of the version of events to which they testified at trial constitute newly discovered evidence warranting a new trial. "A motion for a new trial based on affidavits or testimony suggesting that a key prosecution witness may have lied at trial naturally merits serious consideration from the motion judge." Commonwealth v. Watson, 377 Mass. 814, 838 (1979). However, the mere possibility that the recantation might affect the result of the trial does not necessarily require a new trial, and whether to grant relief lies in the sound discretion of the motion judge. See Commonwealth v. Raymond. 424 Mass. 382, 397 (1997); Commonwealth v. Robertson, 357 Mass. 559, 562 (1970). The judge must determine whether the purported recantation is credible, considering whether the recantation itself is trustworthy or contradicted by other testimony. See Commonwealth v. Spray. 467 Mass. 456,472 (2014); Commonwealth v. Jones, 432 Mass. 623, 633 (2000). The Court may also consider whether, were the recanting witness to  testify at a new trial, her credibility would be so compromised by earlier testimony or statements that her new testimony would be relatively worthless. See Commonwealth v. Ortiz, 393 Mass. 523, 537 (1984).

      The Court has given substantial consideration to the newly tendered witness statements brought forward by Mercado, and finds such statements to be wholly inadequate to bear the weight he places upon them. For the reasons rehearsed ante, the Court does not credit Martinez's purported recantation of her trial identification of Mercado. Similarly, the Court does not credit Destefano's purported repudiation of his grand jury testimony. At the evidentiary hearing, Cripps did not recant or even modify the substance of her trial testimony implicating Mercado in any material respect. And the trial testimony of Michael Gomes -- who testified to having witnessed Mercado at the scene of his brother's murder, and then to having observed him running from the

-47-

apartment hallway with something in his hand immediately after shots were fired - has remained largely unimpeached. No newly discovered and credible evidence along these lines casts reasonable doubt on the justice of Mercado's conviction.

Evewitness Identification Expert

      Mercado contends that Dr. Franklin's scientific testimony suggesting the unreliability of the Cripps, Martinez, and Gomes identifications constitutes newly discovered evidence requiring a new trial. Evidence is newly discovered if it was both unknown to the defendant and counsel at the time of the trial or an earlier new trial motion, and was not reasonably discoverable at that time. Ellis, 475 Mass. at 472. Scientific evidence is newly discovered if it did not exist, or if it differs significantly from the principles relied upon at the time of trial. See Commonwealth v. Rosario, 477 Mass. 69, 76 (2017). See also Commonwealth v. Sullivan, 469 Mass. 340, 350 n.6 (2014) (forensic evidence is newly available if it was unavailable at time of trial because a particular methodology had not yet been developed or gained acceptance by the courts). Expert testimony is not newly discovered, however, simply because recent research may lend more credibility to an expert opinion than was or could have been presented at trial. Shuman, 445 Mass. at 275. See also Commonwealth v. LeFave, 430 Mass. 169, 181 (1999) (noting tension between constantly evolving nature of science and  doctrine of  finality). "To hold otherwise would provide convicted defendants with a new trial whenever they could find a credible expert with new research results supporting claims that the defendant made or could have made at trial" Shuman, 445 Mass. at 275.

      Here, as Attorney Kelleher testified, in the 2006 to 2009 time frame, research on the reliability of eyewitness identification existed, and the defense bar was starting to press for the use of experts in this field. The courts, however, were only then just beginning to recognize the

-48-

admissibility of such expert testimony. Echoing this view, Dr. Franklin testified that, although a substantial amount of research had been conducted in the area of identification and memory science prior to Mercado's trial in 2009, there has been a very significant expansion of the research since then. Indeed, it was not until 2015 that the SIC promulgated its model instruction based on generally accepted scientific principles, expounding upon the critical role expert testimony can play in cases that rest on an eyewitness identification:"Expert testimony may be important to elaborate on the generally accepted principles in a model instruction and to explain how other variables relevant to the particular case can affect the accuracy of the identification." Gomes, 470 Mass. at 378. See also Commonwealth v. German, 483 Mass. 553,569 (2019).

      Under these circumstances, the Court concludes that the expert eyewitness identification testimony proffered by Dr. Franklin qualifies as "newly discovered" for purposes of the present motion. What this field has witnessed in the past ten to fifteen years is not merely the development of a scientific vocabulary to describe previously understood principles, but rather game-changing advances in the underlying science itself. This is the very essence of new discovery. See Commonwealth v. Gaines, SUCR1975-91203, slip op. at 19 (Mass. Super. Ct. Nov. 30, 2022) (Squires-Lee, J.) (concluding that expert eyewitness identification testimony was newly discovered where defendant was tried in 1976, science arose in early l 980s, and SJC recognized scientific developments and convened study group in 2011); Commonwealth v. Jones, SUCR1975-95364, slip op. at 36 (Mass. Super. Ct. Nov. 10, 2022) (Ricciuti, J.) (noting that field of eyewitness identification science "did not reach a significant level of maturity until 2014").

      That said, newly discovered evidence that tends merely to impeach the testimony of a witness will ordinarily not warrant a new trial. Ellis, 475 Mass. at 480;Commonwealth v. Ortiz,

-49-

393 Mass. 523,538 (1984). On the other hand, evidence that seriously undermines the credibility of a key prosecution witness may warrant a new trial in a case that was otherwise weak overall.
See Commonwealth v. Upton, 484 Mass. 155, 168 (2020); Cowels, 470 Mass. at 620. Determining  whether, on balance, newly discovered evidence warrants a new trial is thus left to the sound discretion of the motion judge who performs such balance. Upton, 484 Mass. at 168.

      Mercado argues with some force that the testimony of an expert like Dr. Franklin would undermine the eyewitness identifications of Cripps, Martinez and Michael Gomes, by explaining the various research-based factors that suggest unreliability. There was, after all, no physical evidence tying Mercado to the crime; although it is undisputed that he was present at the scene shortly before the shooting. Mercado' s conviction thus rested on the testimony of three eyewitnesses, coupled with evidence of Mercado's consciousness of guilt in traveling to Puerto Rico shortly after the shooting and giving police a false name when located there. This is the context in which the materiality of expert evidence tending to discredit the eyewitness identifications of Mercado must be evaluated. See Commonwealth v. DiBenedetto, 427 Mass. 414, 420 (1998) (noting that judge has discretion to exclude expert testimony in case that did not involve just one eyewitness and little to no corroboration of identification); Commonwealth v. Santoli, 424 Mass. 837,842 (1997) (noting that exclusion of expert testimony is most likely to be error where there is little or no evidence to corroborate eyewitness identification). Cf. Kirkland, 491 Mass. at 357 (failure to call eyewitness identification expert did not warrant new trial where, given ballistics and DNA evidence, it would not likely have influenced jury's deliberations); Commonwealth v. Watson, 455 Mass. 246, 258 (2009) (where there was additional evidence to corroborate eyewitness identification, exclusion of expert testimony does not require new trial).

-50-

      The SJC has recognized that "eyewitness identification is the greatest source of wrongful convictions," Gomes. 470 Mass. at 360. and emphasized that expert testimony may be an important means of explaining counterintuitive principles in this area. See Commonwealth ·v. Snyder. 475 Mass. 445, 451-52 (2016). See also Commonwealth v. Johnson, 486 Mass. 51, 55 (2020). Dr. Franklin's proffered testimony thoughtfully expounds the numerous factors recognized by the SJC as bearing on the validity of eyewitness identifications, and then applies these principles to the Cripps, Martinez and Gomes identifications to conclude that they are unreliable. After careful review of the overall trial evidence, however, the Court is not persuaded that such expert testimony would likely have been a real factor in the jury's deliberations.

      Critically, this case does not fit the paradigm where the undermining of one questionable eyewitness identification causes the prosecution's case to implode like a Jenga tower. For one, there was not merely a single witness who observed Mercado at the scene of the crime immediately prior to the shooting. Three different witnesses (Cripps, Martinez and Gomes) · placed Mercado in the apartment hallway right before the shots were fired there; one witness (Martinez) observed him holding a firearm; and one witness (Gomes) saw him flee the hallway holding an object in his hand in the immediate aftermath of the shooting.[20] It is one thing to suggest by expert evidence that a single witness's testimony is compromised by estimator variables and other external factors suggestive of unreliability. But it is quite another to marshal science in support of the far less plausible proposition that three different witnesses to the same event all got it wrong. Compare Santoli, 424 Mass. at 842 (suggesting that expert testimony may be critical where guilt hinges on uncorroborated eyewitness identification).

--------------------------------------------

[20] Indeed, it is well to note that Mercado himself conceded at trial that he had been present in the neighboring Correia apartment during the evening hours just prior to the Victim's shooting.

-51-

      Second, this is not a case involving the eyewitness identification of a suspect who was a total stranger to the witness in the context of a wide range of potential perpetrators. Rather, it is undisputed that Mercado was one of only a very few individuals present at the scene of the shooting that night; and, more importantly, he was well known to Cripps and had interacted with Martinez for hours on the evening of the shooting. Many of the factors relied upon by Dr. Franklin in support of her opinion that the trial identifications of Mercado were unreliable are of much less potency in these circumstances. See Commonwealth v. Denson, 489 Mass. 850, 861 (2022) (eyewitness to crime perpetrated by stranger may be more susceptible to mistaken identification than someone familiar with the defendant); Commonwealth v. Vasguez, 482 Mass. 850, 861 (2019) (noting that relevance of expert testimony on potential inaccuracy of eyewitness identification varies based on facts of case).

      Third, the identifications of Mercado in this case were more than simple recollections of events observed visually. Martinez described overhearing conversation in which Mercado and Pelon discussed killing a rival drug dealer who was operating down the hall in Correia's apartment.[21] The eyewitness science testified to by Dr. Franklin does little to undermine the probative force of this direct evidence of motive. See Commonwealth v. Ashley, 427 Mass. 620, 624 (1998) (exclusion of expert testimony was not abuse of discretion where there were numerous eyewitnesses plus evidence of defendant's motive to kill victim).

      Fourth, and further to the three testimonial witnesses who incriminated Mercado at trial, Mercado himself supplied some of the most powerful evidence of guilt presented to the jury. The evidence at trial was undisputed that, immediately following the Victim's shooting, Mercado fled Massachusetts for Puerto Rico, where he adopted a false name which he furnished to police .

--------------------------------------------

[21] Cripps, in turn. testified that Mercado expressed a recurring interest in the going on in this neighboring apartment that suggested (to her) an intent to rob these dealers.

-52-

investigating the Gomes murder when located. It is well settled that flight from a crime venue and adoption of an alias represent probative evidence of consciousness of guilt. See Commonwealth v. Steadman, 489 Mass. 372,386 (2022); Commonwealth v. Dyer, 460 Mass. 728, 754 (2011), cert. denied, 566 U.S. 1026 (2012). Although Mercado insisted at trial that he decamped to Puerto Rico simply to celebrate a girlfriend's birthday, he offered no explanation for either the fake identity he assumed or his false claim to the police that he was not in fact the Thomas Mercado they sought to question.

      In short, and as the SJC has previously recognized in denying the Defendant's principal appeal, this is a case where there was a good deal of evidence - from multiple witnesses - to sustain the verdict that Mercado was the shooter. See Mercado, 466 Mass. at 149-50 and n.10 (noting that ''there was a substantial amount of evidence, from several different sources, supporting the conclusion that the defendant was the person who shot and killed the victim"; and "the testimony of witnesses from both apartments concerning the shooting and surrounding circumstances was consistent and presented a solid basis on which the jury could conclude that the defendant was the shooter"). Taking all matters into fair consideration, this was not the type of case in which the eyewitness identifications were so weak, and so collaterally unsupported by other probative evidence of guilt, that expert testimony explaining the relevant factors undermining their reliability was necessary to assist the jury in its task of determining whether Mercado was the perpetrator of the crime. See Denson, 489 Mass. at 145-46 (exclusion of eyewitness expert testimony was not abuse of discretion where studies that expert highlighted were not sufficiently related to facts surrounding the identifications at issue, and consistency among various identifications and corroborating evidence obviated need for expert assistance); Snyder, 475 Mass. at 454 (holding it was not prejudicial error to exclude expert testimony where

-53-

neither eyewitness placed defendant directly at scene of crime, and there was other substantially incriminating evidence - including a history of extreme animosity between defendant and victim, motive evidence, and defendant's confession to third party); Commonwealth v. Montez, 450 Mass. 736, 758 (2008) (exclusion of expert testimony did not require new trial where rape victim observed assailant for ten minutes in well-lit conditions, and police found knife and gloves used during crime in defendant's apartment). Compare Commonwealth v. Gaines, SUCR1975-91203, slip op. at 23-24 (Mass. Super. Ct. Nov. 30, 2022) (Squires-Lee, J.) (concluding that expert testimony on eyewitness testimony would have been a real factor in jury's deliberations where three unknown men entered shoe repair shop and shot victim during robbery); Commonwealth v. Jones, SUCR1975-95364, slip op. at 40-41 (Mass. Super. Ct. Nov. 10, 2022) (Ricciuti, J.) (granting new trial based on eyewitness expert testimony under confluence of factors analysis, where two unknown men shot and killed victim during robbery of bar); Commonwealth v. Correia, PLCR2011-00494, slip op. at 28 (Mass. Super. Ct. Sept. 10, 2021) (Kelley, J.) (granting new trial based on eyewitness expert testimony under confluence of factors analysis, where masked man robbed victims during home invasion in middle of the night, and one victim made identification based only on viewing suspect's face for just five seconds when he lifted up his mask to wipe away sweat).

      To be sure, defense counsel's cross-examinations and closing arguments at trial were not articulated in terms of the  scientific  reliability  of  the  identifications, and  counsel did  not expressly argue that the eyewitnesses who pointed to Mercado as the shooter could have made an honest but good faith mistake . But this will not, without more, warrant a new trial. See. Ayala. 481 Mass. at 64 (absence of eyewitness identification expert did not require new trial. where defense counsel vigorously cross-examined eyewitness on poor lighting conditions,

-54-

discrepancies in his description of suspect, and impact of his PTSD and bipolar disorder, and argued in closing that witness's identification was unreliable due to these factors); Watson, 455 Mass. at 258 (absence of eyewitness identification expert did not require new trial, where defense counsel aggressively cross-examined eyewitness on suggestive identification procedure and effect of trauma of incident, impaired memory, and taint of heavy medication on ability to identify suspect, and then forcefully argued those factors in closing).

      In the present case, trial counsel did impeach the reliability of the identifications of Mercado by arguing that two of the witnesses were drug-addicted liars unworthy of belief, and the third had previously identified a different person as the shooter. In advocating this theme, defense counsel made certain the jury remained mindful that Cripps and Martinez had been smoking crack all day, and that Gomes had only a limited opportunity to observe the shooter and had previously identified a different individual when presented a photo array by the police. In addition, defense counsel cross-examined each of these witnesses about inconsistencies in their versions of events. Finally, the trial judge gave a lengthy charge on eyewitness identification that, although not as detailed as the SJC model instruction adopted six years later, did touch on the issues of opportunity to observe the suspect, familiarity with the suspect, the circumstances surrounding a photo array, delay in making an identification, prior failures to identify the defendant, and cross-racial identification. This instruction surely alerted the jury to the need to consider whether the eyewitnesses who testified at trial may have made an honest but mistaken identification, and highlighted various factors and variables bearing on the general reliability of

-55-

the identifications.[22]

      Under all of these circumstances, and given the totality of the probative evidence presented at trial, the Court concludes that newly discovered expert evidence of the sort proffered by Dr. Franklin would not have been a real factor in the jury's deliberations. Dr. Franklin's hearing testimony does not cast doubt on the justice of Mercado's conviction, and a new trial is not warranted.

CLAIMS OF TRIAL ERROR

      Mercado's Rule 30 motion additionally asserts a raft of claims of error that could have been (but were not) pressed at the time of his first new trial motion and direct appeal. As a threshold matter, therefore, the Court observes that its review of these claims is limited. The failure to raise a claim that is known and available on direct appeal or a prior motion for post- conviction relief results in a waiver of that claim, regardless of whether the failure to raise it is characterized as ineffective assistance of counsel. Commonwealth v. Forte, 469 Mass. 469, 485 (2014); Rodwell v. Commonwealth, 432 Mass. 1016, 1018 (2000). See also Commonwealth v. Kilburn, 438 Mass. 356, 360 (2003) (rejecting attempt to avoid consequences of waiver by characterizing claim as one of ineffective assistance of appellate counsel; because every waived claim can be couched in ineffectiveness terms, which would render the entire principle of waiver meaningless).

      The Court thus reviews a waived claim for a substantial risk of a miscarriage of justice in the context of the ent ire trial. Id.; Commonwealth v. Randolph, 438 Mass. 290, 294-95 (2002).

--------------------------------------------

[22] Although juries today are extensively instructed regarding the limitations of eyewitness identification, it was not error at the time of Mercado's trial to refuse to give a more detailed instruction. To rule otherwise would , in effect, flout the SJC's pronouncement that its model instruction did not apply retroactively. Snyder, 475 Mass.at 450 n.14.

-56-

Relief is warranted only if there was error that prejudiced the defendant by materially influencing the verdict, such that the Court entertains serious doubt that the result of the trial might have been different had the error not been made. Kilburn, 438 Mass. at 361; Randolph, 438 Mass. at 297. Errors of this magnitude are extraordinary, and relief is seldom granted. Randolph, 438 Mass. at 297 ("Such errors are particularly unlikely where, as here, the defendant's conviction in a capital case has undergone the exacting scrutiny of plenary review under§ 33E.").

Legal Errors by Court

(a) Cross-Examination for Bias

      Mercado first contends that the trial judge committed numerous evidentiary errors that warrant a new trial. He first argues that the Court erred in ref using to allow him to impeach Cripps on the issue of bias and motive to lie. At a mid-trial sidebar conference concerning which criminal matters could be used to impeach Cripps, defense counsel stated that Cripps had an active warrant out of Quincy District Court, but was not being required to surrender and had not been taken into custody by court officers. At that time, the prosecutor informed the judge that Cripps was appearing in court pursuant to the Uniform Law to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, G.L. c. 233, §§ 13A- l3 D, and was therefore immune from process.[23] Defense counsel then interjected that he should nonetheless be allowed to attack Cripps' credibility with the fact that she had an outstanding warrant since 2005 or 2006, and was not answering to a court order that she appear. The Court stated:"That's not true. As has been said, it's part of the restrictions. It's not any option that the Commonwealth has at this point in

--------------------------------------------

[23] Section 13C of this statute provides in relevant part:"If a person comes into this commonwealth in obedience to a summons or order directing him to attend and testify in a criminal proceeding or grand jury investigation or proceeding in this commonwealth he shall not, while in this commonwealth pursuant to such summons or order, be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this commonwealth under the summons or order." G.L. c. 233, § 13C.

-7-

time under the grant of immunity." Defense counsel thereupon impeached Cripps with her convictions for uttering a counterfeit note and possession with intent to distribute a Class E controlled substance.

      Reasonable cross-examination for the purpose of showing bias and prejudice is a matter of right that may assume constitutional dimension if the witness has testified to material facts. Commonwealth v. Martin, 434 Mass. 1016, IO17 (200I); Commonwealth v. LaVeile, 414 Mass. 146, 153 (1993). The Court thus has no discretion to bar inquiry into the subject of bias where there is at least some basis for showing such on the part of a material witness. Commonwealth v. Meas, 467 Mass. 434, 449 (2014); Martin, 434 Mass. at 1017. Whether anticipated evidence in fact demonstrates bias, however, is a matter within the sound discretion of the trial judge. LaVelle, 414 Mass. at 153. A judge may limit cross-examination concerning possible bias where further questioning would be redundant, where there bas been such extensive inquiry that the bias has been sufficiently aired, where the evidence is simply too speculative, or where a contemporaneous voir dire establishes no reasonable possibility of bias. Meas, 467 Mass. at 450.

      In this regard, a defendant has the right to cross-examine prosecution witnesses to reveal a motive to testify falsely on behalf of the government. LaVelie, 414 Mass. at 153. This would include the right to question witnesses about pending criminal charges, in order to show a witness's possible motive for cooperating with the prosecution. Meas, 467 Mass. at 450. Even if no promises have been made to a witness concerning pending charges, it is enough that a prosecution witness hopes for favorable treatment to justify an inquiry concerning bias. Commonwealth v. Gonsalves, 488 Mass. 827, 838 (2022); Meas, 467 Mass. at 450. In the present case, however, and as discussed ante, the Court has determined after hearing that there is no credible evidence that the failure to arrest Cripps on her outstanding warrant either was or

-58-

could reasonably be perceived as a reward or inducement linked to her testimony against Mercado. Accordingly, any restriction on defense counsel's ability to examine Cripps on that subject did not create a substantial likelihood of a miscarriage of justice.

(b) Jury Instructions

      Mercado next contends that the trial judge committed errors in his legal instructions to the jury. First, Mercado argues that the Court's eyewitness identification instruction erroneously failed to track the SJC's model charge in use at the time. See Rodriguez, 378 Mass. at 310-11 (setting forth model instruction). That model charge emphasized the need to find that the circumstances of the identification are convincing beyond a reasonable doubt, and delineated the following factors the jury should consider: the opportunity of the eyewitness to observe the · suspect; the length of time between the crime and the  identification; the witness's prior familiarity with the suspect; the circumstances surrounding any identification procedure; whether the procedure was a lineup or photo array rather than a show-up; whether the witness failed to make a prior identification or made a prior inconsistent identification; and the overall credibility
of the witness. Gomes, 470 Mass. at 361. However, strict adherence to the language of the model Rodriguez instruction was not required. Commonwealth v. Hallet, 427 Mass. 552,558 (1998).

       Mercado specifically objects that the Court omitted from its jury charge the portion of the model instruction that stated:"You may take into account both the strength of the identification, and the circumstances under which the identification was made." See Rodriguez, 378 Mass. at 311. The Court did, however, instruct the jury in similar terms as follows: "Here, you should examine all the circumstances under which the identification was made." Mercado further objects that the Court omitted the portion of the model instruction that provided: "You may also take into account that an identification made by picking the defendant out of a group of

-59-

similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness." See Rodriguez, 378 Mass. at 311.

      A defendant is not entitled to have a jury charge phrased in the exact vocabulary requested, so long as the instruction as a whole conveys the correct meaning of the law. Commonwealth v. Riley, 433 Mass. 266, 271 (2001). In the present case, the Court concludes that, considering the instructions given and the trial evidence as a whole, Mercado has not shown that the trial judge's modest deviations from the model created a substantial likelihood of a miscarriage of justice.[24] See Commonwealth v. Rodriguez, 457 Mass. 461, 475 (2010), rev'd on other grounds, Marshall v. Commonwealth, 463 Mass. 529 (2012) (where eyewitness identification instruction as whole adequately covered the issue, no substantial likelihood of miscarriage of justice arose from failure to include language about honest but mistaken identification). Compare Hallet, 427 Mass. at 558 (omission of portions of instruction relating to one-on-one identification and previous failure to identify suspect was prejudicial, where

--------------------------------------------

[24] The Court's identification instruction informed the jury that if an eyewitness made inconsistent statements of identification. those statements can be used for both substantive and impeachment purposes; that the jury must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant in order to convict; and that the value of an identification depends on the eyewitness's opportunity to observe the suspect and ability to make a reliable identification later. The instruction likewise told the jury to consider: the witness's capacity and adequacy of opportunity to observe the suspect, including how long or short the time available, the distance and lighting conditions, and whether the witness knew the suspect in the past; whether the identification was the product of the witness's own recollection or influenced by the circumstances under which the defendant was presented to the witness; if the defendant was picked out of a photo array, the presentation of the photographs and how it was accomplished; the delay between the crime and the identification, as well as whether a witness ever tried but failed to identify the defendant or made an earlier inconsistent identification; whether the witness is telling the truth or lying, but also whether be might be confused and making a mistake; whether the fact that the defendant is of a different race than the eyewitness might affect the accuracy of the perception or the later identification, because human experience shows that it is more difficult to accurately identify someone of a different race; and "whether there are any other factors present in this case which overcome an y difficulty of identification." The undersigned concludes that the trial judge's insubstantial departures from the model did not prejudice Mercado, where Cripps and Martinez selected Mercado' s photo from an a na y, and where the jury was made aware that Gomes had previously picked a different photograph from an array and identified Mercado as the shooter for the first time at trial.

-60-

eyewitness initially failed to identify defendant during show-up in immediate aftermath of crime and jury asked for redefinition of reasonable doubt); Commonwealth v. Monteiro, 51 Mass. App. Ct. 552, 561 (2001) (where counsel objected to instruction and preserved error, there was only one eyewitness, and overall case against defendant was weak, failure to give several relevant portions of Rodriguez instruction was not harmless error and required new trial). 

      Mercado next argues that a new trial is required because the Court failed to give a requested withdrawal from joint venture instruction. Such an instruction is required upon request where the evidence, if believed, would raise a reasonable doubt whether a defendant had withdrawn from the criminal enterprise. Commonwealth v. Fickett, 403 Mass. 194, 200 (1988). However, it is well settled that a judge is not required to instruct on a hypothesis not supported by the evidence. Commonwealth v. Cook, 419 Mass. 192,201 (1994). "[T]here must be at least an appreciable interval between the alleged termination and the fatal shooting, a detachment from the enterprise before the shooting has become so probable that it reasonably cannot be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it." Commonwealth v. Tillis, 486 Mass. 497, 504 (2020); Cook, 419 Mass. at 201.

      Here, a review of the record reveals that, during a brief discussion about jury instructions that the parties had on the final day of trial, the Court stated: "I don't see any evidence of withdrawal in this case. This is a momentary thing. I don't see any evidence of withdrawal from the joint venture that is part of the evidence in this case." Nonetheless, and notwithstanding the trial judges initial (and appropriate) reaction to the request, the Court did ultimately instruct the jury as follows:

"The defendant is not guilty of a crime committed by joint venture if he withdrew from or abandoned the joint venture in a timely and effective manner. A

-61-

withdrawal is effective only if it was communicated to the other persons in the joint venture and only if it was communicated to them early enough so that they had a reasonable opportunity to abandon the crime, as well. If the withdrawal comes so late that the crime cannot be stopped, it is too late and is ineffective. If there is evidence of withdrawal, the Commonwealth must prove beyond a reasonable doubt that the defendant did not abandon or withdraw before you can find him guilty of joint venture."

This is substantially the same charge as the model instruction on joint venture withdrawal. See Superior Court Criminal Practice Jury Instructions§ 2.3(MCLE 2d ed. 2018). The jury thus charged, Mercado has not shown any instructional error.

      That said, the Court further observes that the trial judge evidently gave this instruction in an over-abundance of caution. For Mercado 's testimony that he went home hours before the shooting occurred, and was not present for any conversation with Pelan or Destefano about a robbery or murder, appears to have been an inadequate evidentiary foundation for a withdrawal charge. Critically, Mercado did not testify that he in any way communicated his intent to withdraw to his purported co-venturers. See Tillis. 486 Mass. at 504 (instruction not warranted based on defendant's self-serving statement to police that he entered apartment, disguised and armed with knife, with intent to steal drugs from victim but fled when neighbors were alerted); Cook, 419 Mass. at 201 (withdrawal instruction not required where defendant claimed he left sidewalk after participating in robbery and beating of victim and returned  to  van before victim was stabbed, but there was no evidence he communicated his intent to withdraw to co-venturers). See also Commonwealth v. Rivera, 464 Mass. 56, 75, cert. denied, 570 U.S. 907 (2013) (mere act of leaving apartment just before shooting held insufficient to communicate withdrawal). Compare Fickett, 403 Mass. at 201 (defendant was entitled to instruction where he testified he told co-venturer he did not want anything to do with planned robbery and asked to be dropped off at home).

-62-

      In short, Mercado has not demonstrated that he was entitled to an instruction on withdrawal from a joint venture; and, even if he was, the record reflects that the trial judge properly instructed the jury on the law in this regard. There is, therefore, no substantial likelihood of a miscarriage of justice presented.

      Mercado next contends that he was prejudiced because the Court's instructions with respect to immunized witnesses were inadequate. The Court declined to give defense counsel's proposed charge, and instead delivered the model instruction as follows:

"In this case, with regard to certain witnesses, we heard that they were immunized, they were granted immunity from prosecution for their testimony in this case. You may take into consideration in assessing the witness's credibility this immunization. You may also take into consideration whether a witness has been promised some benefit that may have induced him to testify."

The foregoing charge is plainly unexceptional in terms of what it conveyed. During deliberations, however, the jury asked a question seeking further guidance on the issue. In response, the Court amplified its instruction as follows:

"Let me explain to you immunity in a more thorough fashion. Testimony was offered by a witness or witnesses who were granted immunity under General Laws Chapter 233, Section 20E. The statute provides in part that a justice of the superior court shall, at the request of the district attorney and after a hearing, issue an order granting immunity to a witness provided that such justice finds that the witness did validly refuse or is likely to refuse to answer questions or produce evidence on the grounds that such testimony or such evidence might tend to incriminate him. A witness who has been granted immunity and who subsequently testifies cannot be prosecuted on account of that matter about which he or she has testified except for perjury or contempt committed while giving his or her testimony. A defendant cannot be convicted solely on the testimony of or the evidence produced by a witness who has been granted immunity under the provisions of General Laws Chapter 233, Section 20E.  Rather, the law requires that in order for a conviction to result in a case where immunized testimony is offered, there must be some evidence from another source that supports the testimony of the immunized witness on at least one element of proof essential to convict the defendant."

-63-

The Court declined, however, to give language requested by defense counsel that the Commonwealth does not know whether the immunized witnesses are actually telling the truth.

      It is undeniable that the Commonwealth's case against Mercado depended on the testimony of immunized witnesses Cripps, Martinez, Gomes and Barros. The Court thus examines whether the instructions, considered as a whole, adequately conveyed the meaning of immunized testimony and correctly indicated that immunized testimony cannot serve as the sole basis fora conviction. Commonwealth v. Dyous, 436 Mass. 719, 727 (2002). Here, the judge's instructions met this standard. The omission of an instruction to scrutinize immunized witness testimony with care is not an error requiring reversal where the jury is otherwise charged thoroughly concerning the factors to use when assessing a witness's credibility (including consideration of promised benefits), and is instructed that a defendant cannot be convicted solely on the basis of immunized testimony. See Commonwealth v. Webb, 468 Mass. 26, 35 (2014). See also Commonwealth v. Gagliardi, 29 Mass. App. Ct. 225, 242, rev. denied, 408 Mass. l103 (1990) (court not required to instruct jury to scrutinize immunized testimony with particular care). Moreover, the Court observes that this is not a case in which the prosecutor repeated ly or harmfully emphasized the immunized witness's obligation to tell the truth. See Commonwealth v. Foxworthy, 473 Mass. 149, 162 (2015). Viewed as a whole, the Court's instructions adequately conveyed the proper treatment to accord immunized testimony, notwithstanding the omission of a statement that the Commonwealth does not know whether any witness is in fact telling the truth. See Commonwealth v. Kindell, 44 Mass. App. Ct. 200, 207, rev. denied, 427 Mass. 1102 (1998) (it was not necessary to instruct jury that prosecutor did not know whether witness was telling the truth). Once again, therefore, Mercado has not shown a substantial likelihood of a miscarriage of justice.

-64-

      Mercado next contends that a new trial is required due to an error in the Court's extreme atrocity or cruelty instruction. After reciting the three factual elements which comprise this theory of murder, the trial judge mistakenly stated:

"In deciding whether the defendant has proved beyond a reasonable doubt that the defendant caused the death of the deceased with extreme atrocity and cruelty, you must consider the presence and degree of the  following factors ...  " (emphasis add ed ). The judge then instructed: "If ... you find the Commonwealth has proved beyond a reasonable doubt these three elements I have just defined... then you should find the defendant guilty of murder in the first degree committed with extreme atrocity or cruelty . If , however, ... you find the Commonwealth has not proved any of these three elements beyond a reasonable doubt, then you must find the defendant guilty of murder in the first degree, based on a theory of extreme atrocity and cruelty (emphasis added.)"

Mercado, 466 Mass. at 153. Mercado argues that his due process rights were violated, because these obvious mis-speaks relieved the Commonwealth of its burden of proof beyond a reasonable doubt. See Commonwealth v. Mitchell, 95 Mass. App. Ct. 406, 412, rev. denied, 483 Mass. 1104 (2019). The SJC considered this very argument in Mercado's direct appeal, however, and concluded that the trial judge's error did not create a substantial likelihood of a miscarriage of justice. See Mercado, 466 Mass. at 153.54.25 Accordingly, principles of direct estoppel bar further consideration of the issue here. See Commonwealth v. Arias, 488 Mass. 1004, 1006 (2021) (defendant cannot relitigate issue under Rule 30(b) that was actually litigated and determined in direct appeal).

© Evidentiary Error

       Mercado argues that the Court erred in admitting Martinez's grand jury testimony without first making necessary findings. A prior inconsistent statement made under oath before

--------------------------------------------

[25] The SJC concluded that, examining the instruction as a whole, where the trial judge repeatedly stressed that the Commonwealth bore the burden to prove beyond a reasonable doubt each clement of the crimes with which Mercado was charged, the jury could not reasonably have been misled by these "slips of the tongue" into applying the wrong burden of proof. Mercado, 466 Mass. at 154.

-65-

the grand jury is admissible for substance if the witness can be effectively cross-examined as to the accuracy of the statement, provided the statement was not coerced and was more than a mere confirmation or denial of the interrogator's assertion. Commonwealth v. Trotto, 487 Mass. 708, 724 (2021); Commonwealth v. Daye, 393 Mass. 55, 73-74 (1984).[26] However, if the witness at trial has no recollection  of the events to which the statement relates, the grand jury testimony is inadmissible because there is no opportunity for effective cross-examination, Daye. 393 Mass. at 73, unless the Court makes a finding that the witness's lack of memory is feigned. Commonwealth v. DePina. 476 Mass. 614, 621 (2017); Commonwealth v. Santos, 463 Mass. 273, 294 (2012). See also Trotto, 487 Mass. at 724 (grand jury statement is inconsistent with witness's in-court testimony where witness feigns lack of memory).

      Here, when Martinez was asked at trial about a conversation she overheard in her kitchen, she stated that she heard Pelan talking but did not hear Mercado talking. The parties then had a
sidebar conference about the admissibility of her grand jury testimony under Daye. The prosecutor did not attempt to refresh Martinez's memory, but instead read into evidence Martinez's grand jury testimony. During that prior testimony, Martinez testified that she heard Mercado tell Pelon that they were going to "kill the guy," and then the two walked into the hallway where Pelon told Mercado that he had to " take care of killing him - that he had to kill the guy."

      Further to the above, when Martinez was asked at trial if she saw Mercado through the apartment door's peephole doing something with a gun, she initially said "no," that Mercado was just standing there with his arms crossed. The prosecutor then asked Martinez if she recalled

--------------------------------------------

[26] If the testimony concerns an essential element of  the crime,  there must also  be some other evidence tending to prove the issue to which the statement relates to sL1stain a conviction. Commonwealth v. Clements, 436 Mass. 190, 193 (2002).

-66-

testifying before the grand jury that she had been looking through the peephole when shots were fired. Martinez replied that Cripps was the person looking through the peephole at that time. The prosecutor then read into evidence Martinez's grand jury testimony, in which Martinez testified that she was looking through the apartment door's peephole when she heard shots and saw Mercado shoot, with the gun in his hand, and then run off.

      Mercado argues that Martinez's grand jury testimony should not have been admitted, because she never testified to a lack of memory. The Court docs not agree. Lack of memory is the predicate for substantive admissibility in some cases, because - in that circumstance - the Court can find a feigned lack of memory at trial to be inconsistent with prior testimony. Trotto, 487 Mass. at 724. However, a lack of memory is not a prerequisite for Daye admissibility where the witness's trial statements are simply inconsistent with her grand jury statements on the same subject. See id. at 724 ("We allow the probative use of a prior statement by a witness who testifies at trial when the prior statement is inconsistent with the witness's in-court testimony, was made under oath (including before a grand jury), was not coerced and was 'more than mere confirmations or denials of statements made by the interrogator."' ); Daye, 393 Mass. at 73-74 (prior inconsistent statement made under oath before grand jury is admissible substantively if witness can be effectively cross-examined as to accuracy of statement, and statement was not coerced and was more than mere confirmation or denial of interrogator's assertion). At  trial, Martinez did not claim a lack of recollection of either the kitchen conversation or her peephole observations. Rather, she testified inconsistently with her grand jury testimony on those subjects. Accordingly, the admission of her testimony for substantive purposes did not depend on a finding that she was feigning a loss of memory. See Commonwealth v. Clements, 436 Mass·. 190, 193-94 (2002} (where, at trial, witness disavowed identification of defendant as shooter, giving

-67-

various reasons for such disavowal, prosecutor properly introduced his inconsistent grand jury testimony substantively). Compare Santos, 463 Mass. at 294-95 (grand jury testimony about seeing defendant with gun improperly admitted where witness testified at trial she did not remember seeing defendant with gun, her memory was not refreshed by her grand jury testimony, and judge d id not find that her lack of memory was feigned).

      Mercado emphasizes that the Court did not find on the record that Martinez's grand jury testimony was not coerced. Although it is preferable for a trial judge to make an express finding that the witness's grand jury testimony was not coerced, it is not essential where the evidence supports an implicit finding of no coercion, such as where the judge shows a familiarity with the requirements for substantive admission. See DePina, 476 Mass. at 621-22. Although Martinez testified that police were pressing her to tell the truth and she was nervous, Martinez did not suggest that her grand jury testimony had been coerced. Given the parties' sidebar discussion about Daye, it is implicit that the trial judge found her testimony to be uncoerced. Accordingly, Mercado has not shown a substantial likelihood of a miscarriage of justice in the admission of Martinez's grand jury testimony.

(d) Prosecutorial Misconduct

      Mercado contends that the prosecutor engaged in prejudicial misconduct by eliciting perjured testimony from Trooper Clements in connection with the Defendant' s pre-trial motion to suppress. It is, of course, true that the Commonwealth may not ethically present testimony which it knows or should know to be false; nor may it allow such testimony to go uncorrected when it appears at trial. Commonwealth v. Ware, 482 Mass. 717, 721 (2019); Commonwealth v. Sullivan, 410 Mass. 521, 532 (1991). A prosecutor has a duty to correct blatantly false testimony on an issue central to the case, even where the defendant himself is able to discern such falsity.

-68-

Ware, 482 Mass. at 725. Minor inconsistencies, however, do not constitute false testimony for this purpose; for they may be the product of any number of factors, including confusion, the passage of time, or poor perception. Forte, 469 Mass. at 491. Sec also Commonwealth v. Fritz, 472 Mass. 341,354 (2015) (fact that witness recants or gives contradictory testimony does not establish that testimony was false or that Commonwealth knew or had reason to know of falsity).

      Here, Mercado has not established that the prosecutor knowingly introduced false evidence at the suppression hearing. Regardless, and assuming without deciding that the prosecutor should have known that Trooper Clements' testimony about the location of the interview was false, such testimony in all events does not warrant a new trial. The motion judge indicated at oral argument that she did not think that the location of the interview would have made a difference to her ruling. See Mercado, 466 Mass. at 148. Moreover, the SJC concluded on direct appeal that, even if the admission of Mercado's statement to the police was error, it did not create a substantial likelihood of a miscarriage of justice given the strength of the other evidence against him. Id. at 148-50. Compare Ware, 482 Mass. at 726 (trooper's blatantly false testimony about what defendant stated in police interview about where he was picked upon night of murder likely influenced jury's verdict and therefore required new trial). In these circumstances, Mercado is not entitled to relitigate the suppression issue under the auspices of Rule 30. See Arias. 488 Mass. at 1006.

      Mercado next contends that the prosecutor violated his right to a fair trial by asking Martinez if she was afraid to testify. Martinez initially testified that, just before the shooting; she looked through the apartment door's peephole and saw Mercado standing in the hallway; that she then heard gunshots while sitting in her bedroom, but denied seeing Mercado doing anything with a gun. The prosecutor then read into the record Martinez's grand jury testimony-- to the

-69-

effect that she did see Mercado shoot a gun and run off - and asked Martinez if that was what she actually saw. Martinez answered in the affirmative. The prosecutor then asked: "And what you said just before[,] that was not true?" To which Martinez replied: "No. l 'm sorry. I am so nervous." The prosecutor then asked: "You're nervous? Are you also scared?" To which Martinez replied: "Yes. Of course."

      Questions concerning a witness' s fear of testifying to the truth may be appropriate in the judge's discretion; but there must be a good faith reason for asking such questions, and counsel should be prepared to disclose that reason to the judge. Commonwealth v. Gibson. 489 Mass. 37, 49 (2022); Commonwealth v. Auguste, 418 Mass. 643. 647 (1994); Commonwealth v. White, 367 Mass. 280, 284-85 (1975). Here, the good faith reason for the prosecutor's question was apparent on the record: viz., Martinez's change in testimony, and her immediate explanation for the change being that she was nervous. See Gibson, 489 Mass. at 49 (witnesses' testimony suggesting fear of defendant was proper to explain their reluctance to testify); Commonwealth v. Fitzgerald, 376 Mass. 402, 412-13 (1978) (asking eyewitness if she was afraid to testify deemed proper where her repudiation of photographic identification and contradiction of earlier statement required explanation). Because Mercado has not shown that the prosecutor asked this question in  bad faith or without reasonable foundation, he has failed to demonstrate that he was deprived of his right to a fair trial. See Gibson, 489 Mass. at 49 & n.26 (relevant questions about fear of testifying do not violate due process).

      Mercado next argues that the prosecutor violated his right to a fair trial by asking him on cross-examination whether Cripps and Martinez were lying when they testified that they observed him in the hallway immediately before the shooting. It is, to be sure, improper to ask a witness during cross-examination to characterize the testimony of other witnesses as truthful or

-70-

untruthful. Commonwealth v. Stuckich, 450 Mass. 449,459 (2008); Commonwealth  v. Fahey, 99 Mass. App. Ct. 304, 310 (2021). It is the province of the jury, not the witnesses, to determine the weight and credibility of testimony, and whether a witness believes that another witness is lying is irrelevant. Commonwealth v. Ward, 15 Mass. App. Ct. 400, 401-02, rev. denied, 389 Mass. 1101 (1983). The prosecutor's question was surely a lapse during Mercado's trial.

      Nonetheless, asking one or two such improper questions is generally not grounds for a new trial. Commonwealth v. Johnson, 4 l 2 Mass. 318, 328 (1992). Sec, M:., Commonwealth v. Kines, 37 Mass. App. Ct. 540, 543 (1994) (several improper questions to defendant were not basis for reversal); Commonwealth v. Kirkpatrick, 26 Mass. App. Ct. 595, 603 (1988), rev. denied, 404 Mass. 1101 (1989}(no substantial risk of miscarriage of justice in two improper questions put to defendant}; Commonwealth v. Flanagan, 20 Mass. App. Ct. 472, 477-78, denied, 396 Mass. 1101 (1985) (no prejudicial error in four improper questions asked of defendant). Compare Commonwealth v. Triplett, 398 Mass. 561, 567 (1986) (repeatedly asking defendant whether his moth er, the critical eyewitness against him, was lying created substantial likelihood of miscarriage of justice); Commonwealth v. Long, 17 Mass. App. Ct. 707, 708-09, rev. denied, 392 Mass. 1102 (1984) (asking defendant at least 100 questions about whether he heard particular testimony of almost every witness against him in attempt to get him to comment on inconsistencies with his own testimony created substantial likelihood of miscarriage of justice}. Moreover, it bears note that the prosecutor did not so much as mention this aspect of Mercado's testimony during closing argument, and the Court instructed the jury that they were the exclusive judges of which witnesses and testimony to believe. Accordingly, the isolate d question Mercado cites as improper did not create a substantial likelihood of a miscarriage of justice. See Commonwealth  v. Hachey, 2015 WL 9311607 at *2 (Mass.  App. Ct. Rule 1:28)

-71-

(finding no substantial risk of miscarriage of justice where inquiry was limited to two improper questions and judge instructed  jury that they alone determined what testimony was credible).[27]

      Finally, Mercado argues that the prosecutor's improper closing argument warrants a new trial. During his closing, the prosecutor stated:"Corrin Cripps hears this fellah here say, 'We're gonna go rob them."' In point of fact, Cripps did not so testify; rather, she testified that she believed, based on something Mercado said, that Mercado planned to rip off the Victim.[28] A prosecutor may argue forcefully for a conviction based on the evidence and the reasonable inferences drawn from that evidence; but a prosecutor may not misstate the evidence, or refer to facts not in evidence. Commonwealth v. Niemic, 483 Mass. 571, 593 (2019); Commonwealth v. Young, 461 Mass. 198, 206 (2012). In assessing the materiality of an alleged misstatement in a closing, the Court considers -- in the aggregate -- the entire argument, the evidence at trial, and the judge's instructions to the jury. Commonwealth  v. Coren, 437 Mass. 723, 731 (2002).

      Here, there was evidence that: the Victim and his brothers were preparing cocaine for sale; when Mercado instructed Cripps to find out what these men had in their apartment, she told him they had cocaine; Mercado, Pelan and Destefano were huddled in the kitchen talking; and Cripps believed Mercado wanted to rob the Victim based on something she heard Mercado say. Even if the prosecutor's overstated characterization of Cripps' testimony was not a reasonable inference drawn from this evidence, it did not create a substantial likelihood of a miscarriage of justice given the strong trial evidence as a whole, counsel's failure to object, and the countervailing jury instruction that closing arguments are not evidence and that the jury's

--------------------------------------------

[27] Although defense counsel objected to the question at trial Mercado failed to raise th is issue either in his prior new trial motion or on direct appeal. These failures result in waiver, and dictate a less exacting standard of review under Rule 30. See ante.

[28] The SJC concluded that Cripps' declared belief regarding Mercado's intent was objectionable, and could not support a conviction of felony murder based on the predicate offense of armed robbery. Mercado, 466 Mass.at 155.

-72-

recollection of what witnesses did and did not say controlled. See, Commonwealth v. · Henderson, 486 Mass. 296, 308-09 (2020) (misstatement about eyewitness's familiarity with defendant and whether eyewitness saw defendant with gun did not create substantial likelihood of miscarriage of justice, given instructions that jury was sole finder of fact and arguments are not evidence). Compare Niemie, 483Mass. at 598-99 (under prejudicial error standard, where prosecutor made ten misstatements of fact that bore on critical issue of premeditation, where case against defendant was not overwhelming, and where misstatements were coupled with improper appeals to sympathy, court had serious doubt whether result of trial would have been different had errors not been made); Coren, 437 Mass. at 731 (misstatements that victim told defendant "don't shoot" and that defendant was yelling and pushing gun  into victim's stomach went  to heart of prosecution's case, and thus required new trial where defendant claimed accident). In the present circumstances, Mercado has simply not demonstrated prosecutorial misconduct sufficient to warrant a new trial.

CONFLUENCE OF FACTORS

      Finally, Mercado urges the Court to grant him a new trial based on a "confluence of factors" analysis. Even where a defendant cannot meet the standard for obtaining a new trial on the basis of any specific theory (such as newly discovered evidence or ineffective assistance of counsel), the Court may nonetheless exercise its broad discretion in applying the principle that a new trial should be granted where - taking all factors into cumulative consideration - justice may not have been done. Commonwealth v. Brescia, 471 Mass. 381, 389-90 (2015).

      The Court has given a good deal of thought to Mercado's position in this regard, and the argument is by no means frivolous. In weighing whether all the circumstances warrant a new trial, however, the Rule 30 judge must keep in mind that a defendant is entitled to a fair trial and 

-73-

not a perfect one. Commonwealth v. Rosario, 477 Mass. 69, 77 (2017); Brescia, 471 Mass. at 391. The judge thus considers whether a "confluence of factors" might have caused a substantial risk of a miscarriage of justice, focusing on their probable effect in the aggregate on the jury's decision-making and not on his own personal assessment of the trial record. Rosario, 477 Mass. at 78; Brescia, 471 Mass. at 391. A substantial risk of a miscarriage of justice exists when the Court entertains serious doubt whether the outcome of the trial might have been different in light of all the challenged rulings and evolved understandings of the facts and law.[29]

      As discussed ante, Mercado has not shown the existence of any admissible evidence to support a viable third-party culprit defense. Nor has the Court been shown that any eyewitness to the shooting -- Gomes, Martinez or Cripps -- has credibly recanted his or her trial testimony implicating Mercado in the crime. Mercado has likewise not shown the existence of any undisclosed threats, promises, or inducements extended to Gomes or Martinez incentivizing their incrimination of him. Mercado has not shown the existence of threats that induced Cripps to testify; but he has shown that the Commonwealth failed to disclose that Cripps received admission to a drug treatment program, cigarettes and meals, and brief hotel stays and air fare in connection with her appearance at trial. In addition, Mercado has shown that he was restricted when cross-examining Cripps about her failure to be arrested, was improperly asked whether Cripps and Martinez were lying, and that the prosecutor inaccurately stated in closing that Cripps had "heard" Mercado say something about a robbery.

      The question then becomes whether these trial errors -- coupled with the withheld evidence of benefits to Cripps, Dr. Franklin's expert testimony concerning eyewitness

--------------------------------------------

[2]9 One thing needs to be said at the outset. The fact that Mercado has asserted a large number of putative trial errors that the Court has found to lack legal merit (wholly apart from considerations of materiality under the governing standard of review) does not affect the confluence of fact on analysis.

-74-

identification, and the absence of a more detailed eyewitness identification instruction given to the jury - cumulatively call into question the justice of Mercado' s conviction. They do not. Given the circumstances surrounding Gomes', Martinez' s, and Cripps' identification of Mercado as the shooter, and the totality of the other trial evidence, the Court is simply not persuaded that cross-examination of Cripps based on her non-arrest, omission of the robbery misstatement, Dr. Franklin's expert testimony, a more detailed jury instruction, and disclosure of the modest benefits received by Cripps would likely have undermined these eyewitness identifications to a degree that would affect the outcome of the trial.

      To the extent that Dr. Franklin's opinion regarding the unreliability of the eye witness identifications rests on assumptions that these witnesses were threatened and have since recanted their trial testimony, her opinion is not credited because such assumptions are unsupported by the record. Further, the Court acknowledges that, in a case where a single eyewitness, previously unfamiliar with the defendant, identifies him as the perpetrator, expert opinion about the variables that bear on the reliability of an eyewitness identification may give rise to meaningful doubt as to whether the outcome of the trial might have been different. See, Commonwealth v. Correia, PLCR2011-00494, slip op. at 28 (Mass. Super. Ct. Sept. 10, 2021) (Kelley, J.) (granting new trial based on expert eyewitness testimony under confluence of factors analysis, where masked stranger robbed victims in home invasion in middle of the night and sole basis for conviction was victim's identification based on viewing suspect's face for just five seconds when he lifted his mask to wipe away sweat). But this simply is not such a case.

      This is, rather, a case where three different eyewitnesses, two of whom were familiar with Mercado before the shooting, identified him as the perpetrator, where Mercado himself admitted to being present at the scene, a private hallway accessible to only a limited number of

-75-

people, immediately before the shooting; where there was testimony that Mercado was overheard discussing killing the Victim with a confederate; and where there was powerful evidence of consciousness of guilt reflected in Mercado's contemporaneous flight from the jurisdiction and adoption of an aliasabout which he lied to police who were investigating the Victim's murder. Under these circumstances, it is highly doubtful that Dr. Franklin's testimony, even if coupled with a more detailed identification instruction and evidence of undisclosed benefits to Cripps, would lead a reasonable jury to conclude that all three eyewitnesses falsely or mistakenly identified Mercado. The jury clearly found these interlocking identifications to be credible, notwithstanding far more impeaching evidence that: all three eyewitnesses testified under a grant of immunity; Gomes was involved in dealing drugs, had only a limited opportunity to observe the shooter, and had initially failed to select Mercado's photograph out of a police array; Cripps was a drug addict who would do anything (including trade sex) for crack, was high on the evening in question, continued to get high the day after the shooting, and was a convicted criminal; and Martinez was a drug dealer and addict, was high on the evening in question, continued to get high the following day, was at all times under the influence of medications for mental health issues, and gave inconsistent statements to the police and grand jury. 

      Further to the foregoing, this is not a case where the jury received no guidance with respect to the estimating factors that bear on the reliability of an eyewitness identification. The jury was appropriately instructed to consider a witness's opportunity to observe the suspect, prior familiarity with the suspect, the circumstances surrounding a photo array, any delay in making the identification, prior failures to identify the defendant, and cross-racial identification. Under these circumstances, the absence of Dr. Franklin's proposed testimony that Michael Gomes' identification might be unreliable due to a profile view with the suspect's hair covered, the .

-76-

presence of a weapon, and Gomes' exposure to Mercado's face during the photo array and immunity hearing did not create a substantial risk of a miscarriage of justice. Similarly, the absence of Dr. Franklin's proposed testimony that Cripps' identification might be unreliable due to a profile view with the suspect’s hair covered, the presence of multiple people in the hallway, memory impairment and suggestibility due to long-term cocaine use, and the benefit of receiving drug treatment, cigarettes and meals, and a hotel stay from the Commonwealth did not create a substantial risk of a miscarriage of justice. Finally, the absence of Dr. Franklin's proposed testimony that Martinez's identification might be unreliable due to the internal contradictions contained in her statements, her viewing the suspect through a distorting peephole, her status as a long-term drug addict, her taking of antipsychotic medications, and her immunity from prosecution did not create a substantial risk of a miscarriage of justice. Most of these factors were the subject of at least general instruction by  the  trial judge; and, taken singly or  together, the collective analysis now proffered by Dr. Franklin leaves  the Court with no serious concern that justice in this case may not have been done. Nor does consideration of the restriction on cross-examining Cripps about her failure to be arrested, the improper questions about whether Cripps and Martinez were lying, and/or the prosecutor's inaccurate statement  in closing that Cripps heard Mercado say something about a robbery alter the Court's assessment.

      All matters fairly considered, this case does not present one of the "extraordinary fact patterns that. .. frustrate[s] even meticulous efforts to do justice," and warrants the granting of a new trial under a confluence of factors analysis. See Brescia, 471 Mass. at 391. Viewing the case evidence as a whole, the Court cannot conclude that the absence of the now-proffered evidence supporting Mercado deprived him of a substantial ground of defense rendering his trial fundamentally unfair. Compare Rosario. 477 Mass. at 75, 78-8l (finding substantial likelihood of

-77-

miscarriage of justice where there were irregularities in defendant's confession and, in 20 years since trial, fire science had evolved substantially, leading to new investigative protocols and research that provided alternate theory of cause of fire such that forensic evidence was equally suggestive of accident rather than arson); .474 Mass. at 766-69 (finding substantial likelihood of miscarriage of justice from absence of newly available expert testimony, where such testimony would have bolstered defendant's unsupported trial defense of accident and informed jury that severe injuries suffered by victim could be caused by fall rather than shaken baby syndrome); Brescia, 471 Mass. at 389 .91 (new trial warranted where defendant who testified in his own defense at murder trial suffered stroke during second day of cross- examination, and Commonwealth used his apparent lack of memory to undermine his credibility). Because Mercado has not shown a substantial risk of a miscarriage of justice der all the circumstances presented , a confluence of factors analysis does not require a new trial.

ORDER

For all the foregoing reasons, it is hereby ORDERED that Defendant's Motion for New Trial be DENIED.

@/s/Robert B. Gordon
Justice of the Superior Court

@June 27, 2023